# United States Court of Appeals
## For the First Circuit

No. 04-2398

UNITED STATES OF AMERICA,

Appellee,

v.

COREY D. WIGGIN,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Steven J. McAuliffe, U.S. District Judge]

Before

Lynch, Circuit Judge,
Stahl, Senior Circuit Judge,
and Lipez, Circuit Judge.

Judith H. Mizner, Assistant Federal Public Defender, for appellant.
Mark E. Howard, Assistant United States Attorney, with whom Thomas P. Colantuono, United States Attorney, was on brief, for appellee.

November 17, 2005

**LYNCH**, **Circuit Judge**.  Corey D. Wiggin was convicted, after a jury trial, of conspiracy to distribute cocaine.  The conspiracy involved at least twenty kilograms of cocaine per year and continued for several years.  Wiggin, twenty-six years old at the time of sentencing, received the statutory minimum term of imprisonment of ten years.

On appeal, Wiggin presents one challenge to his conviction and one to his sentence.  He first argues that the district court, in denying his post-trial claim of incompetency to stand trial, misapplied the legal standard by not properly considering whether he had the ability to assist his counsel.  The main argument for incompetency was that Wiggin suffered mental deficiencies from an accident which led him, against his self-interest, to refuse to enter a plea agreement under which he might have received only a five-year sentence.  As to his sentence, Wiggin urges that ambiguities in the jury instructions and verdict slip could have misled the jury into believing the amount of cocaine involved in the overall conspiracy and the amount attributable to him had to be the same, and that therefore the jury did not truly make a defendant-specific drug quantity finding.  We affirm Wiggin's conviction and sentence.

A.          **The Trial and Sentence**

On February 6, 2002, Wiggin and six others were charged by indictment with conspiring to distribute five or more kilograms of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846.[1]  The government tendered plea agreements to Wiggin and some of the other defendants, offering reduced sentences in exchange for cooperation.  Several of the defendants -- including Robert DeFelice, who had sold Wiggin substantial quantities of cocaine, and Todd Burley, the higher-level dealer who had sold to DeFelice -- accepted these offers and agreed to testify.  Wiggin, however, refused.

The government had offered as part of its proposal to Wiggin to stipulate that the amount of cocaine involved in his case was 500 grams; this stipulation would have permitted the court to sentence Wiggin to as little as five years in prison.  See 21 U.S.C. § 841(b)(1)(B) (statutory minimum of five years' imprisonment for distribution of amounts from 500 grams up to, but not including, five kilograms).  Wiggin's attorney, who considered the offer "very reasonable," communicated it to Wiggin and recommended that he accept it.  Wiggin refused, in part because he believed DeFelice and Burley would not testify against him -- a belief he maintained even after his attorney showed him proof that

---

[1]  A superseding indictment on April 30, 2003 re-charged the same conspiracy offense against Wiggin, two others from the initial indictment, and two additional defendants.

the men had reached plea agreements and had consented to testify. Wiggin stated at the post-trial competency hearing (discussed later) that DeFelice had told him that he "had nothing to worry about" and that "he wasn't going to testify to anything against me."

At trial, the government presented evidence that Wiggin had dealt cocaine from 1999 through 2001. Burley and DeFelice testified against Wiggin. Their testimony and that of other witnesses showed that DeFelice had sold cocaine to Wiggin thirty to forty times, that the quantities per transaction varied but "towards the end" were often eight to ten ounces, and that the largest quantity DeFelice had sold to Wiggin was fifteen ounces. DeFelice testified that Wiggin had told him he subsequently resold the cocaine to multiple people. Further, Burley testified that Wiggin personally brought money to Burley's home to pay for cocaine at least three times and accompanied DeFelice to Burley's home to make payments on at least twenty occasions.[2]

At the conclusion of the six-day trial, the district court instructed the jury that the government had to prove beyond a reasonable doubt that Wiggin conspired to distribute cocaine. If the jury found that the government had so proved, it had to "go on

---

[2]  DeFelice bought between eight and thirty ounces of cocaine from Burley per transaction, with one transaction every seven to fourteen days, over an extended period of time.

-4-

to consider the weight of the cocaine that was involved in the conspiracy and is attributable to the defendant." The court added:

> A given amount of cocaine was involved in the conspiracy if the government proves beyond a reasonable doubt that the conspirators agreed to distribute that amount of cocaine. A given amount of cocaine is attributable to the defendant if he knew or could have reasonably foreseen that the conspiracy involved that amount of cocaine. The government must prove beyond a reasonable doubt both that the conspiracy involved a given amount of cocaine and that the defendant knew or could have reasonably foreseen that a conspiracy involved that amount of cocaine.

On September 12, 2003, the jury returned a guilty verdict against Wiggin:

> 1) We, the jury in the above captioned case, return the following verdicts:
>
> COUNT ONE:
>
> ___ Not Guilty  **X** Guilty
>
> 2) We, the jury, find that the weight of cocaine involved in the conspiracy described in Count One of the indictment and attributable to defendant was:
>
> DRUG WEIGHT:
>
> **X** Five (5) kilograms or more of cocaine
>
> ___ Five hundred (500) grams or more, but less than five (5) kilograms, of cocaine
>
> ___ Less than five hundred (500) grams of cocaine

Based on this drug quantity finding, the district court sentenced Wiggin to the statutory minimum of ten years' imprisonment, see 21

-5-

U.S.C. § 841(b)(1)(A), to be followed by five years of supervised release.

**B.        The Competency Issue**

On September 19, 2003, which was a week after the jury returned its guilty verdict but prior to sentencing, Wiggin's attorney moved pursuant to 18 U.S.C. § 4241 for a hearing to determine whether Wiggin had been competent to stand trial. The attorney and Wiggin's mother submitted affidavits stating, inter alia, that Wiggin (1) had broken his neck in a 1997 motorcycle accident and had subsequently suffered memory loss and a reduction in cognitive capacities, (2) had abused marijuana and cocaine for years, (3) had unwisely rejected the favorable plea offer, (4) had had difficulty remembering events and providing non-contradictory answers to his attorney's questions, and (5) had not given his attorney important details about the criminal case prior to trial. Wiggin's attorney attempted to explain the belated timing of his motion in an affidavit, stating that he "was first apprised of Mr. Wiggin's memory loss and his reduced cognitive ability on the fourth day of the [six-day] trial by his mother and his girl friend."

The district court held an initial hearing on the competency motion on June 14, 2004. Two psychologists testified for the defense, having examined Wiggin after the trial had concluded. The first, Dr. Alexandria Weida, a forensic

psychologist for the Commonwealth of Massachusetts, stated that she had met with Wiggin on two occasions[3] and administered various psychological tests, including the Bender-Gestalt test and the Wechsler Memory Scales. She testified that when she asked Wiggin whether he understood terms such as "conspiracy," he answered in the affirmative but could not provide a coherent explanation when pressed for details. She also said Wiggin was "confused" about the role of his attorney and the consequences of plea bargaining. Dr. Weida concluded that at the time of the trial, Wiggin was not able rationally to understand the proceedings and charges against him and was not "competent to fully assist his counsel."

The second psychologist, Dr. Frederick Kelso, met with Wiggin in May 2004 and also concluded that Wiggin had been incompetent to stand trial. Dr. Kelso cited two causes: (1) a mental defect and cognitive deficits caused by mild traumatic brain injury, and (2) the mental disease of cocaine abuse. Dr. Kelso testified that Wiggin had a "minimal understanding" of the concept of conspiracy. He stated that he had administered a test that showed Wiggin had trouble thinking in abstractions; the sort of results he observed were "very commonly seen in certain kinds of patients who have suffered a traumatic brain injury." Dr. Kelso opined that Wiggin's decision to trust DeFelice's assurances that

---

[3] At least one of the meetings was in March 2004; the date of the other is not clear from the record.

Wiggin "didn't have anything to worry about," even after his attorney told him DeFelice would testify for the prosecution, was connected to Wiggin's difficulty in thinking in abstractions. Dr. Kelso concluded that Wiggin's assessment of the possibility of accepting a plea deal had not been rational.

Dr. William Ryan, a forensic psychologist with the Federal Bureau of Prisons, testified for the government. Dr. Ryan testified that he had interviewed Wiggin in the fall of 2003[4] and had subjected him to a test called the Minnesota Multiphasic Personality Inventory, 2nd Edition. He stated that Wiggin's results indicated that (1) he had basic comprehension skills and could understand and consistently answer true-false questions;[5] and (2) he was exaggerating any mental illness he suffered, suggesting "either a cry for help or some deliberate attempt to portray himself as very mentally ill." Dr. Ryan testified that he had spoken with staff members at the prison where Wiggin was incarcerated and had been told that Wiggin functioned adequately

---

[4] Dr. Ryan testified that he interviewed Wiggin during Wiggin's stay at a federal prison, which he believed lasted from "October through pretty late in December."

[5] By "consistently answer," Dr. Ryan testified, he meant that Wiggin gave answers that matched up logically with answers elsewhere on the test. For example, if a test-taker were to mark "true" next to the statement "I am always depressed," he would have to mark "false" next to the statement "I am never depressed" in order to be answering consistently. Dr. Ryan testified that consistent answers indicate that "the person is understanding the questioning."

and understood directions. He also testified that, during an interview, Wiggin was able to count backward by threes, indicating an ability to concentrate, and was able to give adequate definitions of legal terms such as perjury, witness, verdict, and sentence. Wiggin was unable adequately to define several other legal terms when first asked, but when Dr. Ryan explained them to him and then asked later if he remembered what they meant, Wiggin was able to recall the definitions.

According to Dr. Ryan, Wiggin said during the interview that he had not trusted his attorney at trial but later realized his attorney had been trying to help him. Asked on cross-examination whether he found Wiggin's decision to trust his friends and family instead of his attorney irrational, Dr. Ryan responded: "it may not have been a good decision, but there was no irrational, you know, mental illness entering into that decision." Based on, inter alia, the testing he administered, his interview of Wiggin, and his interviews of prison staff, Dr. Ryan opined that Wiggin suffered from depressive symptoms, post-traumatic stress disorder, and a cognitive disorder possibly due to head trauma. However, he concluded that Wiggin was nonetheless functional, rational, and competent. He testified that Wiggin "conversed, he discussed, he remembered, . . . he retained what he learned, it all impressed me as a person who was competent to stand trial."

After hearing this testimony, the district court found that the defense had not established by a preponderance that Wiggin was incompetent to stand trial. However, the court noted that it was troubled that the record was not developed with respect to Wiggin's possible organic brain injury: the testifying psychologists had inferred such an injury, but no physician had examined Wiggin for purposes of the competency hearing. The court therefore ordered that Wiggin be examined by Dr. Albert Drukteinis, a physician and forensic psychiatrist, "to establish whether or not he does suffer from some mental defect or disease" and offer an opinion on whether Wiggin "was mentally competent to stand trial."

Dr. Drukteinis examined Wiggin pursuant to the district court's order and submitted a report on August 19, 2004. On September 30, 2004,[6] he testified that Wiggin was competent to stand trial.[7] Dr. Drukteinis said Wiggin "has some . . . problems with memory, concentration, maintaining attention," though there was no "real evidence that [those problems were] because of traumatic brain injury." Dr. Drukteinis' report stated that Wiggin

---

[6]  This was the date of the second portion of the competency hearing and of Wiggin's sentencing, which immediately followed the district court's competency ruling.

[7]  Dr. Drukteinis testified that his examination necessarily evaluated competency at present, not the time of the trial. However, he added that in Wiggin's case, "if he had the capacity to understand things like conspiracy today and the capacity to understand the seriousness of this charge today, then there's no reason why he couldn't have had that capacity then barring some extra aggravating [effects] of cocaine that he was using."

had told him that at the time of trial he did not think the criminal charges he faced were serious, and that he thought so in part because his friends and family -- including his parents, his fiancée, and DeFelice -- did not seem particularly worried. Asked by defense counsel whether he thought Wiggin's faith in his family rational, Dr. Drukteinis replied: "I don't see where that would be irrational. I think people listen to lots of different sources in that kind of a predicament." Dr. Drukteinis testified that Wiggin's failure to assist defense counsel stemmed more from Wiggin's lack of trust in his attorney than from any mental disease or defect.

Wiggin himself also testified at the September 30 hearing. Asked by his attorney what he thought when he was told his friends were going to testify against him, Wiggin replied: "I didn't think it was true." He stated that DeFelice had told him he would not testify for the prosecution and that he had no reason to doubt DeFelice's assurances. Asked why he rejected the plea offer and went to trial, Wiggin replied: "I just, to be honest with you, I don't know. I just, my family and my friends, I was listening to them."

Following this testimony, Wiggin's counsel summarized his competency argument, saying Wiggin's faith that his friends would not testify against him was related to his mental defects. "He didn't know me, I was saying things he didn't want to hear,"

-11-

Wiggin's attorney argued. "He rejected that and that's . . . an irrational position."

After listening to defense counsel's summation, the district court ruled from the bench that Wiggin had been competent to stand trial. The court stated:

> I think [Wiggin has] made a series of just terrible decisions that are certainly not the product of informed consideration, but I credit Dr. Drukteinis's evaluation and I credit Dr. Ryan's evaluation that he was competent to stand trial at the time of trial. He is competent to stand trial now. . . . I find by a preponderance of the evidence that he simply did not suffer from a mental disease or defect that renders him mentally incompetent; that is, that he was or is unable to understand the nature and consequences of the proceeding against him or to assist properly in his defense.

Defense counsel objected that Dr. Ryan and Dr. Drukteinis made determinations of competency at the time of examination, not at the time of the September 2003 trial. The court replied: "[A]s Dr. Drukteinis made clear, there's nothing to suggest that [Wiggin's] condition was any different at the time of trial than it was at the time Dr. Ryan examined him or Dr. Drukteinis examined him."

**II.**

**A.        The Competency Determination**

The determination of a criminal defendant's competency to stand trial is governed by the standards laid out at 18 U.S.C.

§ 4241.[8] This provision states that at any time prior to sentencing, "the defendant or the attorney for the Government may file a motion for a hearing to determine the mental competency of the defendant. The court shall grant the motion, or shall order such a hearing on its own motion, if there is reasonable cause to believe" that the defendant is incompetent. Id. § 4241(a). It further provides:

> If, after the hearing, the court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense, the court shall commit the defendant to the custody of the Attorney General [for hospitalization].

Id. § 4241(d).

"We uphold a district judge's determination of competency after a [§ 4241] hearing unless [that determination is] clearly erroneous." United States v. Santos, 131 F.3d 16, 20 (1st Cir. 1997). Wiggin, as we understand his argument, contends that the district court erred in concluding that he met the second prong of the competency test -- that he was able "to assist properly in his defense." He argues that the error is demonstrated by two things: (1) that the court referred to the "understand the nature and

_____

[8] Section 4241 adopts the competency test articulated by the Supreme Court in Dusky v. United States, 362 U.S. 402 (1960) (per curiam).

-13-

consequences of the proceedings" prong of the § 4241 test a few times without also referring at the same time to the second prong, and (2) that the evidence showed that Wiggin could not in fact assist his counsel. He also argues that point (1) demonstrates that the district court incorrectly applied the law to the facts, and that as a result our review in this instance should be plenary, instead of for clear error.

None of these arguments has any merit. As to point (1) and the standard of review issue, the district court at the time it made its competency determination specifically and correctly described both prongs and issued a finding as to each: it stated that Wiggin "simply did not suffer from a mental disease or defect that renders him . . . unable to understand the nature and consequences of the proceeding against him or to assist properly in his defense." Further, the court also described the second prong correctly at least three other times during the two-day hearing: it noted during separate colloquies with defense counsel and an expert witness that competency requires the capacity to "adequately participate in [one's] defense" and to "meaningfully assist in [one's] defense"; it also concluded the competency hearing by reiterating that it had found that Wiggin did not have a "mental disease or defect that . . . deprived him of the ability . . . to adequately assist in his defense."

This is not an instance in which a court articulated what is said to be an incorrect rule of law. In that circumstance, a matter of pure law, we would review the question de novo. Here the trial court articulated the correct standard. Indeed, we have upheld findings of competency where the district court offered far less of an articulation, saying the court need not "parse the definition of 'competency'" nor "arrive at specific findings as to each component." United States v. Muriel-Cruz, 412 F.3d 9, 14 (1st Cir. 2005) (reviewing for plain error); see also id. at 12 ("Not only can we ascertain no plain error, we are unable to discern what additional actions reasonably could have been expected of the district court.").

Nor was there error in the application of the law of competency to the facts. The trial court, unlike Wiggin's experts, had actually seen the defendant and his counsel interact at trial. The court also had heard expert testimony that Wiggin was competent and rational, and it was entitled to credit that testimony. See Santos, 131 F.3d at 20-21. Competent people can and do make decisions which others consider irrational. Starting with the premise that he could rely on the assurances of his "friends" not to turn on him and that he could not trust a lawyer he did not know, Wiggin's decision not to accept the plea was naive and ill-informed, but not irrational. Further, his lawyer never once during trial suggested that Wiggin could not assist in his own

defense. Wiggin's regrets that he did not accept the plea bargain he was offered are not enough.

**B.          The Jury Instructions/Verdict Slip Issue**

Wiggin's second argument is that "[c]ombined, the [jury] instructions and verdict form are ambiguous and confusing" and that the ambiguity requires vacation of his sentence and remand for resentencing without the ten-year mandatory minimum. His position, as we understand it, is that the judge's instructions gave the impression that the total amount of cocaine involved in the conspiracy and the amount attributable to Wiggin had to be identical, and that the verdict form, with its single blank for finding the weight of cocaine "involved in the conspiracy" and "attributable to defendant," added to that impression. He argues that this requires resentencing because, given the ambiguity, the jury should not be deemed to have made the defendant-specific drug quantity finding that triggered the ten-year statutory minimum. Because the jury included a drug quantity finding on the verdict form, the district court did not make such a finding at sentencing; Wiggin therefore argues that if the jury's finding was invalid, no actor made the requisite drug quantity finding.

Wiggin did not object to the instructions or verdict slip at trial, and so we review for plain error. <u>United States</u> v. <u>Molina</u>, 407 F.3d 511, 527 (1st Cir. 2005) (plain error review of jury instructions); <u>Negron</u> v. <u>Caleb Brett U.S.A., Inc.</u>, 212 F.3d

-16-

666, 672 (1st Cir. 2000) (plain error review where appellant had objected to neither the jury instructions nor the verdict form). To prevail under this standard, Wiggin must show that (1) an error occurred, (2) the error was clear or obvious, (3) the error affected his substantial rights, and (4) the error also seriously impaired the fairness, integrity, or public reputation of judicial proceedings. United States v. Olano, 507 U.S. 725, 732, 734 (1993).

This is not such a case. There was no error; much less were the other three requirements of Olano met. The district court began the relevant portion of the jury instructions by stating that "[a] given amount of cocaine was involved in the conspiracy if the government proves beyond a reasonable doubt that the conspirators agreed to distribute that amount of cocaine." It then stated in a separate sentence that "[a] given amount of cocaine is attributable to the defendant if he knew or could have reasonably foreseen that the conspiracy involved that amount of cocaine." This instruction clearly and correctly states the law. See United States v. Colon-Solis, 354 F.3d 101, 103 (1st Cir. 2004) (requiring, for sentencing in drug conspiracy cases, "an individualized finding as to drug amounts attributable to, or foreseeable by, [the] defendant").

The district court added that "[t]he government must prove beyond a reasonable doubt both that the conspiracy involved a given amount of cocaine and that the defendant knew or could have

-17-

reasonably foreseen that a conspiracy involved that amount of cocaine."  Wiggin suggests that the conjunctive phrasing of this instruction implies that the two amounts are identical, and that the phrasing of the verdict form did nothing to undo any confusion on the point.  We disagree.  The instruction in fact stressed to the jury that the reasonable doubt standard applied to both issues (amount involved in the conspiracy and amount reasonably foreseeable to the defendant).  Further, the form itself makes clear that the jury was to make a separate finding as to the amount attributable to the defendant.

### III.

We **<u>affirm</u>** Wiggin's conviction and sentence.