# United States Court of Appeals
## For the First Circuit

No. 07-1575

UNITED STATES OF AMERICA,

Appellee,

v.

JULIO CARRION SANTIAGO,

Defendant, Appellant.
_____

No. 07-1718

UNITED STATES OF AMERICA

Appellee,

v.

PEDRO MIRANDA

Defendant, Appellant.
_____

No. 07-1728

UNITED STATES OF AMERICA

Appellee,

v.

JUAN NUNEZ,

Defendant, Appellant.
_____

No. 07-2017

UNITED STATES OF AMERICA,

Appellee,

v.

JOSE O. RODRIGUEZ,

Defendant, Appellant.

―――――――――

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

―――――――――

Before

Lynch, Chief Judge,

Boudin and Lipez, Circuit Judges.

―――――――――

Janet Hetherwick Pumphrey, by appointment of the court, for appellant Julio Carrion Santiago.
John F. Palmer, by appointment of the court, and Law Office of John F. Palmer on brief for appellant Pedro Miranda.
Roger Witkin, by appointment of the court, for appellant Juan Nunez.
Robert L. Sheketoff, by appointment of the court, for appellant Jose O. Rodriguez.
Daniel Steven Goodman, Criminal Division, Appellate Section, Department of Justice, with whom Michael J. Sullivan, United States Attorney, and William F. Bloomer, Assistant United States Attorney, were on consolidated brief for appellee.

―――――――――

March 19, 2009

―――――――――

**BOUDIN**, <u>**Circuit Judge**</u>.  This appeal arises from the convictions of five co-defendants (only four seek review) on drug conspiracy charges and (as to one defendant) on associated firearms charges.  We begin with a brief summary of the background and proceedings and return later to the evidence pertinent to sufficiency claims and to other trial and sentencing claims raised by the defendants.

The case began with a year-long investigation into a large-scale heroin distribution operation in or around Lowell, Massachusetts, starting in summer 2003 and ending with arrests in October 2004.  The investigation encompassed the five defendants who went to trial and seven others who were indicted but pled guilty.  The four appellants before us are Julio Carrion Santiago, Pedro Miranda, Juan Nunez and Jose Rodriguez; the fifth defendant who was tried but has withdrawn his appeal is Carlos Sanchez.

The investigation was led by the U.S. Drug Enforcement Agency ("DEA") but included state and local police.  In its course, agents tracked Santiago's van with a GPS unit and conducted visual surveillance of it; conducted court authorized wiretaps of cell phones of the defendants; tracked and observed transactions among the defendants revealed by cell phone conversations; and ultimately seized Santiago's van (seizing concealed drugs) and searched his residence and those of Rodriguez (seizing drugs) and Miranda (seizing paraphernalia).

In the search of Santiago's residence, officers found a drug press in the hallway between two apartments—one of them Santiago's—and, in the attic above the press, a 9 millimeter gun and an ammunition clip along with heroin, a digital scale, a bag with silencers and a magazine for a smaller weapon. They found additional paraphernalia inside Santiago's apartment. Only in Nunez's case were no drugs or paraphernalia seized.

Nunez, Santiago, Rodriguez, Miranda and eight other defendants were charged with conspiracy to distribute heroin and to possess heroin with intent to distribute, 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1) (2006). Santiago was also charged with possessing firearms in furtherance of a drug trafficking crime, 18 U.S.C. § 924(c) (2006), and by superceding indictment with possession of unregistered firearms, 26 U.S.C. § 5861(d) (2006). A ten day jury trial ensued for the five defendants who declined to plead guilty.

The jury convicted all five on the conspiracy count and found that the conspiracy involved at least one kilogram of heroin, triggering a statutory maximum sentence of life imprisonment. 21 U.S.C. §§ 846, 841(b)(1). Santiago was found guilty on both weapons charges. The district court at sentencing made individualized drug quantity determinations. On his three counts, Santiago was sentenced to 248 months' imprisonment. On the

conspiracy count, Rodriguez, Nunez and Miranda were sentenced to 264, 151 and 72 months, respectively.

On appeal, Santiago disputes the sufficiency of the evidence to support the jury's finding that the amount of drugs was at least one kilogram of heroin. Review, of course, requires that we assume that the jury accepted the government's evidence and drew inferences in its favor. United States v. Sherman, 551 F.3d 45, 49 (1st Cir. 2008) (citation omitted). A rational jury could easily find that the conspiracy involved at least a kilogram of heroin.

Almost a half kilogram (493.3 grams) was seized from Santiago's van; another 115.9 grams were found in the attic of his building. An additional 180.7 grams were seized from Reynaldo Rivera (a member of the conspiracy who pled guilty), and an undercover agent purchased 135.4 grams through Rivera. Agents seized 19.8 grams that they saw Santiago place in the door of Rivera's car. And agents recovered almost 60 grams from Rodriguez. That adds up to over a kilo--not including additional amounts seized from other co-conspirators.

Santiago says that the drugs found in the attic should not be attributed to the conspiracy and--in a different sufficiency argument--says that the guns in the attic should not be attributed to him. While there were two apartments upstairs in Santiago's building, Santiago was the only tenant on the floor below the attic at the time of the search and had been for five months. The

building manager testified that he knew the attic existed but he had not been there for many years, and he was not aware that it no longer had pull-down access stairs.

The jury knew about Santiago's drug dealing, the proximity of his apartment to the attic, the corresponding paraphernalia in his apartment, the concealment of access to the attic and the absence of others likely to have used the attic. Under these circumstances, the jury was free to reason that the drugs in the attic were part of the conspiracy and that the gun was constructively possessed by Santiago. See United States v. Barnes, 890 F.2d 545, 549-50 (1st Cir. 1989), cert. denied, 494 U.S. 1019 (1990); United States v. Calle-Cardenas, 837 F.2d 30, 32 (1st Cir.), cert. denied, 485 U.S. 1024 (1988).

Santiago also says that nothing shows that the gun seized in the attic was used in furtherance of his drug trafficking. Relatedly, he objects to a state trooper's testimony that individuals who have drugs keep firearms because "[i]t is a business that involves a large quantity of money" leading to a "number of instances in which robberies are committed against each individual." Santiago's objection to the trooper's testimony is not developed but in any event is unpersuasive, and the sufficiency claim fails even if the testimony is disregarded.

The trooper's testimony merely explained circumstantial evidence from which the jury could have drawn the obvious inference

that the gun was there to protect the stockpile of drugs.  The drugs and gun were concealed together within easy reach of the attic opening; in addition, the gun was loaded and unregistered. See Sherman, 551 F.3d at 50-51.  The jury's inference was entirely appropriate.  United States v. Garner, 338 F.3d 78, 81 (1st Cir.), cert. denied, 540 U.S. 1084 (2003); United States v. Luciano, 329 F.3d 1, 6 (1st Cir. 2003).

Santiago and Miranda both object to testimony by Marcos Chavez, who acted as an undercover agent during the investigation; he testified at trial as to the meaning of code words or phrases used by the defendants, primarily to designate drug quantities. The objections are that Chavez had not been qualified as an expert, that no advance disclosure of expert testimony was provided, see Fed. R. Crim. P. 16, and that inferences drawn were speculative and their admission an abuse of discretion.

Chavez testified as a lay witness: such witnesses may give opinions as long as they are "rationally based on the perception of the witness," are "helpful to . . . the determination of a fact in issue," and are "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701.  Testimony about coded language--like, for example, testimony about vehicle speed--can be admissible, depending on its

content and other circumstances, either as lay or expert testimony.[1]

Here, Chavez had been involved in the investigation, listened to over 90 percent of the intercepts, learned voices and patterns, and heard and used the coded language in his undercover drug buys relating to the investigation. "Rule 701 . . . is meant to admit testimony based on the lay expertise a witness personally acquires through experience, often on the job." United States v. Maher, 454 F.3d 13, 24 (1st Cir.), cert. denied, 549 U.S. 1025 (2006); United States v. Ayala-Pizarro, 407 F.3d 25, 28 (1st Cir.), cert. denied, 546 U.S. 902 (2005) (quoting Fed. R. Evid. 701 advisory committee's note).

Further, various of the code word interpretations were borne out by the conduct of the defendants. For example, Chavez's interpretation of Rodriguez's request for "$60 out of the bank" was supported by the seizure of 60 grams of heroin (10 from his person and 50 from his home) shortly thereafter. Far from being speculative, Chavez's interpretations corresponded to locations, drug quantities and the like. There was no error in admitting the testimony.

_____

[1]Compare United States v. Rivera-Rosario, 300 F.3d 1, 17 (1st Cir. 2002) (allowing expert testimony about the meanings of "code words"), and United States v. Hoffman, 832 F.2d 1299, 1310 (1st Cir. 1987) (same), with United States v. Grullon, 545 F.3d 93, 95-96 (1st Cir. 2008) (allowing lay opinion testimony on meaning of coded language), and United States v. Gaines, 170 F.3d 72, 77-78 (1st Cir. 1999) (same).

On cross-examination, Miranda's counsel questioned Chavez about the use of coded language in the affidavit that agents had prepared to support the wiretap warrant and, on redirect, the prosecutor asked Chavez whether the agents who provided the affidavit had included interpretations of the codes' meanings, which Chavez answered affirmatively. Miranda objects to this affirmative response as hearsay and a violation of the Confrontation Clause.

The brief reference to the affidavit was not offered for the truth of anything said in the affidavit--the interpretations themselves were not elicited--and so presents no hearsay problem. Fed. R. Evid. 801. Likewise there is no Confrontation Clause problem. United States v. Rodriguez-Duran, 507 F.3d 749, 769 n.28 (1st Cir. 2007), cert. denied, 128 S. Ct. 1726, 1729 (2008). And, if this single answer had been error, it would have been harmless beyond a reasonable doubt in light of the overwhelming evidence. See United States v. Earle, 488 F.3d 537, 546 (1st Cir.), cert. denied, 128 S. Ct. 423 (2007).

Nunez raises two issues relating to drug quantity. First, he says that the jury should have been required to make individual drug quantity findings for each defendant, as opposed to making a conspiracy-wide quantity determination. Nunez's challenge to the jury's conspiracy-wide drug finding was not preserved--and he in fact affirmatively approved the jury instruction--so at best

-9-

our review is only for plain error.  United States v. Griffin, 524 F.3d 71, 76 (1st Cir. 2008).

The Supreme Court requires a jury finding as to drug quantity if it increases the statutory maximum sentence, Apprendi v. New Jersey, 530 U.S. 466, 490 (2000), assertedly on constitutional grounds; but whether the statutory maximum sentence turns on what the conspiracy embraced or on what was foreseeable separately to each conspirator raises at least questions of statutory construction.  Needless to say, specific jury determinations as to quantity for each conspirator could be complicated.

Our recent case law requires that the jury decide the conspiracy-wide quantity, which establishes the maximum penalty the district court may impose under the statute.  See United States v. De La Cruz, 514 F.3d 121, 136-37 (1st Cir. 2008); United States v. González-Vélez, 466 F.3d 27, 40 (1st Cir. 2006).[2]  Then, at sentencing, the judge finds the amount reasonably foreseeable to each defendant, which is used to determine his sentence.  United States v. Malouf, 466 F.3d 21, 26 (1st Cir. 2006), cert. denied, 127 S. Ct. 1892 (2007).  That is what happened here and, under our precedents, this was the correct process.

---

[2]United States v. Wiggin, 429 F.3d 31 (1st Cir. 2005), allowed an instruction requiring an individualized jury determination, but the focus of the challenge was to the clarity of the instruction, id. at 38, and our later decisions govern the question before us.

-10-

Nunez's second claim is that the evidence does not support the amount that the district court attributed to him at sentencing--between one and three kilograms. He says that the only drugs conclusively linked to him were the 493.3 grams seized from Santiago's van immediately after the final visit by Santiago to Nunez in New York. Santiago made other visits to him but Nunez says that it is speculation to assume drugs were involved or to calculate the amounts. The objection was not preserved at sentencing so review is for plain error. United States v. Silva, 554 F.3d 13, 21 (1st Cir. 2009).

Nunez says there is no evidence of drugs for any of the earlier trips, but during at least one of Santiago's trips (in September 2004) officers observed Santiago and Nunez engage in behavior similar to that of October 2004 trip where the half kilo was seized. United States v. Sklar, 920 F.2d 107, 113-14 (1st Cir. 1990) (similarity between transactions permits drug quantity estimates). Conversations between Nunez and Santiago further supported the inference that additional drugs were supplied.

As to quantity, the district court took a conservative approach in attributing only a quarter kilo to each of Santiago's other trips to Nunez's apartment instead of the nearly half kilo seized on the final visit--which the pre-sentence report had recommended as the proper estimate for each trip. The extrapolation was not rote but reflected similarity between the

trips, the GPS evidence, the wiretap evidence and the seizure following the final trip. There was no error.

Finally, Rodriguez challenges only his sentence, and his only developed claim is for a remand in light of Kimbrough v. United States, 128 S. Ct. 558 (2007), to give the district court a chance to evaluate a policy-based objection to the career offender guideline. Based on drug quantity and criminal history, Rodriguez's guideline range would have been 110 to 137 months; but because his record also triggered the career offender guideline, U.S.S.G. § 4B1.1, the range increased to 360 months to life.

At sentencing, Rodriguez's primary argument was that he barely qualified as a career offender, one of his predicate offenses falling almost outside of the guideline's look-back provision, and that a career offender guideline sentence would be much higher than the sentences of his more culpable co-defendants. The district court imposed a below-guideline sentence of 264 months, describing Rodriguez's record as "atrocious" but noting the need to take into account his co-defendants' shorter sentences.

We have remanded pre-Kimbrough sentences without preserved claims where "there [was] some explicit indication that [the district court] might well alter its sentence." United States v. Boardman, 528 F.3d 86, 87 (1st Cir. 2008). The trial judge's comments here gave no such indication but strongly suggested, as in United States v. King, 554 F.3d 177 (1st Cir. 2009), that the judge

-12-

had no doubt "about the soundness of the career offender guidelines as applied."  Id. at 182.

The defendants' convictions and sentences are affirmed.