# United States Court of Appeals
## For the First Circuit

No. 09-2504

UNITED STATES OF AMERICA,

Appellee,

v.

BONNY L. REYNOLDS,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

Before

Boudin, Circuit Judge,
Souter,* Associate Justice,
and Stahl, Circuit Judge.

Alan J. Black, by Appointment of the Court, for appellant.
Renée M. Bunker, Assistant U.S. Attorney, with whom Thomas E. Delahanty II, United States Attorney, was on brief for appellee.

May 17, 2011

---

*The Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

**STAHL, <u>Circuit Judge</u>.** A grand jury charged Bonny Reynolds with knowingly possessing two firearms after having been committed to a mental institution, in violation of 18 U.S.C. § 922(g)(4); and, because the serial number on one of the firearms was obliterated, knowingly possessing a firearm with an obliterated serial number, in violation of 18 U.S.C. § 922(k). After the district court determined that she was sufficiently competent, Reynolds opted for what became a one-day bench trial and was found guilty as charged. The district court sentenced Reynolds to a two-year term of imprisonment followed by three years' supervised release. Reynolds raises four issues on appeal, all of which relate, at least in part, to her competency. Specifically, she argues that, because of her mental infirmities, (1) she should not have been found competent to stand trial, (2) she did not voluntarily consent to the firearms search, (3) the judge could not be impartial and should have recused himself, and (4) she did not voluntarily waive her right to a jury trial. We affirm.

## I. Background

### A. Search and Seizure Incident[1]

At 11:00 A.M. on May 2, 2006, two uniformed police officers responded to investigate a call by Philip Bradford

---

[1]Upon review of a denial of a motion to suppress, we recount the facts "'as the trial court found them, consistent with record support.'" <u>United States</u> v. <u>Andrade</u>, 551 F.3d 103, 106 (1st Cir. 2008) (quoting <u>United States</u> v. <u>Lee</u>, 317 F.3d 26, 30 (1st Cir. 2003)).

complaining of an unwelcome woman in his residence. When the officers arrived, Mr. Bradford explained to them that he had initially given the woman, Reynolds, permission to stay at his home, but that he wanted Reynolds to leave because she had failed to contribute to the rent. Although Officer Scott Harris believed the problem was a civil rather than a criminal matter, with Mr. Bradford's permission, he and his partner entered the home to continue their investigation.

Mr. Bradford told the officers that Reynolds had two unloaded firearms, and so the officers drew their guns when they proceeded towards the back bedroom where Mr. Bradford indicated Reynolds was living. Upon reaching the bedroom, Officer Harris knocked on the door and heard a woman inside say, "Come in." The officers entered and saw Reynolds lying on the bed. Officer Harris asked Reynolds whether she had any guns. Reynolds answered yes and pointed to the headboard behind her. The guns were not visible. Without asking permission, Officer Harris walked towards the headboard, opened a compartment within, and upon seeing the guns, removed them.

After securing the firearms, Officer Harris ran Reynolds' name through dispatch and discovered that one month prior, she had been involuntarily committed to a mental hospital for psychological evaluation. As a result of the statutory prohibition of her possession, see 18 U.S.C. § 922(g)(4), the officers seized the

-3-

weapons over Reynolds' protests and left. At no time was Reynolds placed under arrest, handcuffed, or physically searched. On December 11, 2007, a grand jury indicted Reynolds on the two firearm charges.

## B.  The Proceedings Below

Reynolds' claims on appeal implicate various proceedings that occurred in the district court, which we detail here as relevant.

### 1.  First Competency Hearing

Following a series of missteps by Reynolds after her arrest and arraignment, including repeated violations of her conditions of release, subsequent re-arrests, and her failure to appear at a motions hearing, the government moved pursuant to 18 U.S.C. § 4241 to determine whether Reynolds was competent to stand trial. Reynolds' counsel at the time assented to the government's motion. The magistrate judge granted the motion and, at defense counsel's request, ordered Dr. Diane Tennies to evaluate Reynolds and to file a report with the court.

Dr. Tennies' report concluded that although Reynolds could understand the nature of the criminal proceedings, she was unlikely to make informed decisions necessary to assist properly in her defense. She explained, however, that Reynolds' background indicated that Reynolds "stabilizes quickly" when properly treated. The magistrate judge reviewed Dr. Tennies' report and held a

-4-

hearing during which both Dr. Tennies and Reynolds testified. Based on this information, the judge recommended that the district court find Reynolds incompetent to proceed to trial at the present time, but that she could become competent in the near future with proper treatment. Neither party filed any objections. On July 30, 2008, the district court accepted the recommended decision and ordered Reynolds committed to a suitable facility for hospitalization pending further assessment. Reynolds' commitment was to the Federal Medical Center, Carswell ("Carswell") located in Fort Worth, Texas.

### 2. Second Competency Hearing

On February 2, 2009, the district court received a letter from the Carswell warden accompanied by a report written by forensic psychologist Dr. Leslie Powers and reviewed by chief psychologist Dr. Robert Gregg, which concluded that Reynolds' competence was restored. Specifically, the report explained that Reynolds had "a good understanding of the role and function of . . . the Judge, jury, prosecution, her attorney, and witnesses," that she "accurately described the different plea options," that Reynolds believed "that her attorney was working in her best interest," and that she could ask "for clarification if she did not understand something her attorney was saying or something said in the Courtroom." In view of the report, the district court ordered a second competency hearing. Counsel attended a conference with

the court prior to the hearing, wherein defense counsel stated that he had met with Reynolds several times and that she was "in good shape." He explained that he would not be contesting competence.

The district court began the hearing by asking Reynolds several questions to assess her demeanor and presentation and to determine whether she was competent. Reynolds explained to the court that she understood "exactly" the proceedings being held, and she stated that she and her lawyer had discussed the issues involved, which defense counsel confirmed. Throughout the hearing, the court continued to check Reynolds' understanding of the proceedings, and each time, Reynolds assured the court that she followed. She conferred with defense counsel several times and expressed her wish to exercise her right to allocute.

During her allocution, Reynolds stated that she was mistreated by both personnel and fellow patients while in custody, and that her problems were physical and not psychological. Reynolds then proceeded to discuss the circumstances surrounding the charges. Both defense counsel and the court interrupted Reynolds to tell her that she "shouldn't talk about the case," to which Reynolds responded, "Why? . . . I don't have anything to hide." Defense counsel conferred with Reynolds and then explained on record that anything Reynolds said "could ultimately be counterproductive," but Reynolds continued.

Reynolds stated that she removed two firearms from her

mother's house because a neighbor, who was a felon, had put them there "and the serial numbers were scratched off of them." She said that she was intending to take the weapons to the police station but that one of her roommates learned of the guns and called the sheriff's department. Reynolds explained that a police officer then came into her room without knocking and asked if she had guns, to which she responded affirmatively, showing them to him. Reynolds said that the officer took the guns and arrested her. Reynolds stated that she did not see how she broke the law since she was helping her mother.

When Reynolds finished speaking, the district court accepted the Carswell forensic report without objection. It then stated that, in view of the report and its observations of Reynolds during the hearing, Reynolds was competent to stand trial. Specifically, it stated that Reynolds had "sufficient present ability to consult with her attorney with a reasonable degree of rational understanding," and that she had a "rational, as well as factual, understanding not only of the proceedings against her, but also the possible consequences of the proceedings." Although the court found that Reynolds would continue to be competent in the future, it stated that it would "remain vigilant regarding that issue." Neither party objected.

### 3. Motion to Suppress

Prior to her first competency hearing, Reynolds filed a

motion to suppress the firearms seized from her bedroom. Because of Reynolds' competency concerns, however, a decision on the motion was delayed. After the district court found Reynolds competent to face the charges against her, it rescheduled a motion hearing.

In her suppression motion, Reynolds argued that she had not consented to the search of her headboard. Specifically, she contended that when Officer Harris asked whether she had any firearms, she understood his question to concern only the existence of the weapons, and she did not know that the officer intended to search for and seize them. The government argued that Reynolds gave consent for the search and that her consent was voluntary.

At the motion hearing, Officer Harris was the only witness; defense counsel stated that he reviewed with Reynolds her right to testify, but that she chose to "follow[] [his] advice" and not take the stand. The court then asked the parties whether they wished to file supplemental memoranda before the court ruled on the motion. Neither party offered additional materials nor suggested that the court incorporate evidence admitted during the competency hearings into the suppression proceedings.

On April 21, 2009, the district court denied Reynolds' motion. It found that Reynolds provided implied consent for Officer Harris to search the headboard. By pointing to the headboard in response to the officer's question asking whether Reynolds had any weapons, Reynolds demonstrated that she knew the

officer intended to find the firearms. With respect to voluntariness, the court concluded that, upon consideration of the totality of circumstances, there was no showing that Reynolds' will was overborne by overtly coercive police conduct. In addition, it held that even though Reynolds had been committed to a mental institution one month before the search and that an indication of a defendant's mental deficiency weighs against voluntariness, the parties did not raise this issue or provide the court with any guidance as to how to interpret Reynolds' prior commitment or history of mental illness. With no showing that Reynolds was affected by an underlying illness, nor direct evidence regarding her mental capacity at the time of the search, the court found that the factor did not defeat Reynolds' voluntariness.[2]

### 4. Change of Plea Hearing

Shortly after the district court denied Reynolds' motion to suppress, her counsel moved to withdraw from representation. The district court granted the motion and appointed Reynolds new counsel. Reynolds then entered a plea agreement with the government, and the district court convened a change of plea hearing on July 24, 2009. At the hearing, the court asked Reynolds multiple questions to determine her competence. It also asked

---

[2]Reynolds also argued in her motion that officer safety concerns did not justify the seizure of the firearms and that the subsequent examination of one of the guns to recover the obliterated serial number was unlawful. The district court rejected both contentions, and neither is at issue on appeal.

several times whether Reynolds understood the proceedings, to which Reynolds responded affirmatively. It found Reynolds competent to proceed with the plea.

The plea hearing, however, altered course and became a trial scheduling conference because Reynolds stated that she did not believe she was guilty; she simply wanted to speed up the proceedings to "get out of jail" more quickly. The court explained that it could not accept her plea under those circumstances, but that timing was not an issue and she could proceed to trial in short order. Defense counsel then told the court that Reynolds was considering the possibility of a bench trial. The court stated that a bench trial would not necessarily occur more quickly than a jury trial and that, regardless of the trial requested, it could get underway in the next few weeks. The court worked with counsel to set a tentative schedule, with only three days' difference between the start of a bench or jury trial. When the court noted that Reynolds seemed to prefer a jury-waived trial, Reynolds interjected, "Excuse me. Did you say jury trial?" The court clarified that it had said "jury-waived" to which Reynolds responded, "Oh, okay."

### 5. Bench Trial and Sentencing

One week after the plea hearing, the bench trial began. Before proceeding, the court reviewed with Reynolds the waiver of her right to a jury trial to ensure that she understood the waiver

-10-

and that it was voluntary.  Reynolds confirmed that she understood that she was entitled to a jury trial and to participate in jury selection.  She also confirmed her understanding that upon acceptance of her jury waiver, the district court would decide her innocence or guilt.  The court verified that Reynolds had discussed with counsel her right to a jury trial, along with the advantages and disadvantages of proceeding with one.  Reynolds told the court that she had read, understood, and voluntarily signed her waiver of a jury trial.  Therefore, the court approved the waiver, finding that Reynolds "knowingly and voluntarily waived her right to trial by jury."

Officer Harris testified at trial, as did an agent with the Bureau of Alcohol, Tobacco, and Firearms.  Reynolds also testified at trial.  With respect to the charges against her, she stated that she did not "look[] over th[e] firearms to find the serial numbers," nor did she purposefully remove the serial number on one of the guns.  Several pieces of evidence and stipulations were entered into evidence without objection, including the transcript from the second competency hearing.

The court found Reynolds guilty of the two charges.  In doing so, it relied in part on Reynolds' allocution during her second competency hearing, specifically her statements explaining that she had taken the guns from her mother's house because the serial numbers had been removed.

Three months later, the court sentenced Reynolds. It first determined that Reynolds was competent to be sentenced, and then it sentenced her to twenty-four months' imprisonment followed by three years of supervised release. This appeal followed.

## II. Analysis

Reynolds raises four issues on appeal, which we address in turn.

## A. Reynolds' Competence

Reynolds contends that the district court erred by finding her competent to stand trial during the second competency hearing. It is well established that the conviction of an incompetent defendant violates due process. <u>United States</u> v. <u>Giron-Reyes</u>, 234 F.3d 78, 80 (1st Cir. 2000) (citing <u>Pate</u> v. <u>Robinson</u>, 383 U.S. 375, 385 (1966)). To be found competent, a defendant must have both "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "a rational as well as factual understanding of the proceedings against him." <u>Dusky</u> v. <u>United States</u>, 362 U.S. 402, 402 (1960).

Congress incorporated this standard into 18 U.S.C. § 4241, which establishes the procedures for determining a criminal defendant's competence. Pursuant to § 4241, a defendant or the government may file a motion for a hearing to determine the mental competency of the defendant. <u>Id.</u> § 4241(a). The court will grant the motion or, on its own initiative, order such a hearing "if

-12-

there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." Id.

> After the hearing, if
>
> the court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense, the court shall commit the defendant to the custody of the Attorney General. The Attorney General shall hospitalize the defendant for treatment in a suitable facility.

Id. § 4241(d).

The statute also contemplates a defendant's restored competence. Pursuant to § 4241(e), after a defendant's commitment, the director of the treating facility must notify the court when he or she determines that the defendant has regained competency. Thereafter, the court must hold another hearing to determine the defendant's competence. Id.; see also Giron-Reyes, 234 F.3d 78. At the hearing, the defendant "shall be afforded an opportunity to testify, to present evidence, to subpoena witnesses on his behalf, and to confront and cross-examine witnesses who appear." 18 U.S.C. § 4247(d).

Upon this second hearing, if

-13-

> [t]he court finds by a preponderance of the evidence that the defendant has recovered to such an extent that he is able to understand the nature and consequences of the proceedings against him and to assist properly in his defense, the court shall order his immediate discharge from the facility in which he is hospitalized and shall set the date for trial or other proceedings.

Id. § 4241(e).

Reynolds raises two challenges to the district court's finding that her competency had been restored. First, she argues that her behavior and comments during the second competency hearing belied the court's determination. She points to the fact that at the hearing, she spoke of alleged abuses she endured while in custody, made admissions when discussing the search and seizure incident against the advice of both the court and counsel, and stated that she did not "see how [she] broke the law at all" since she believed she was helping her mother. Second, she asserts that the court's procedures during the hearing were infirm and that, at a minimum, the district court should have required the Carswell doctors who certified that she had regained competence to have testified and been subject to cross-examination by both counsel and the district court.

Typically, we review a district court's determination of competence under a clearly erroneous standard. United States v. Wiggin, 429 F.3d 31, 37 (1st Cir. 2005). Reynolds concedes, however, that she did not raise her challenge at any time below,

-14-

and that plain error review controls. See United States v. Muriel-Cruz, 412 F.3d 9, 11 (1st Cir. 2005) (applying plain error review to unpreserved claim of improper competency hearing procedures); Giron-Reyes, 234 F.3d at 80 (applying plain error review to unpreserved claim that after defendant found incompetent, court must hold second competency hearing and find the defendant mentally fit before proceeding with the case). Under plain error review, we reverse only if (1) "an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." United States v. Landry, 631 F.3d 597, 606 (1st Cir. 2011). In United States v. Figueroa-González, 621 F.3d 44, 47 & n.3 (1st Cir. 2010), we acknowledged that "[w]hether a waiver would be valid if the defendant were incompetent might be debated." Id. (citing Pate, 383 U.S. at 384 ("[I]t is contradictory to argue that a defendant may be incompetent, and yet knowingly or intelligently 'waive' his right to have the court determine his capacity to stand trial.")). Here, however, the issue is inconsequential because Reynolds' claim fails under either standard of review.

First, the district court did not err in finding Reynolds competent. In making its decision, the court relied on multiple pieces of evidence that favored its determination. It considered the unobjected-to, lengthy forensic evaluation conducted by the

-15-

Carswell clinical staff who treated and evaluated Reynolds for four months and who found Reynolds restored to competency.  See Muriel-Cruz, 412 F.3d at 13 ("[C]ertificates [from mental facilities noting a defendant's recovery] unquestionably constitute competent evidence of a defendant's mental condition.").  It also considered defense counsel's independent assessment that Reynolds was in "good shape" and that he had no reason to contest competency.  See Medina v. California, 505 U.S. 437, 450 (1992) ("[D]efense counsel will often have the best-informed view of the defendant's ability to participate in his defense."); Muriel-Cruz, 412 F.3d at 13 ("[D]efense counsel enjoys a unique vantage for observing whether her client is competent.").

In addition, the district court heard from Reynolds herself, and it judged Reynolds' abilities first-hand.  Reynolds told the court that she understood "exactly" the proceedings being held and that she had discussed the issues with her lawyer.  She conferred with her counsel during the hearing, answered the court's questions, and understood that she had a right to allocute.  At no point was the court presented with any conflicting judgments as to Reynolds' competency.  Indeed, even though Dr. Tennies concluded at the first competency hearing that Reynolds was not competent to stand trial, she explained that Reynolds "stabilizes quickly" and could be remediated "within a period of weeks even."

Reynolds claims that the remarks she made during her

-16-

allocution required the court to find that she was mentally unfit, but we are unpersuaded. Strange remarks or behavior do not in themselves necessitate a finding of incompetence. See United States v. Lebrón, 76 F.3d 29, 32 (1st Cir. 1996) (finding "irrational and outrageous behavior" did not require finding of incompetence); see also Jermyn v. Horn, 266 F.3d 257, 292-95 (3d Cir. 2001) ("strange behavior" did not require court to order sua sponte competency evaluation). Further, although Reynolds' admissions during her allocution may have ultimately been used against her, they alone do not prove that she could not assist in her own defense. "Competent people can and do make decisions which others consider irrational." Wiggin, 429 F.3d at 37-38; see also United States v. Moussaoui, 591 F.3d 263, 293-94 (4th Cir. 2010) (finding no error in district court's determination that defendant was competent despite pleading guilty against the advice of counsel). Reynolds' comments were ill-advised, but the district court was confronted with several strong pieces of evidence confirming that Reynolds understood the proceedings against her and could assist in her defense. The expert report said as much, both defense counsel and the government agreed, and Reynolds' behavior during the hearing — including her repeated conferences with counsel, understanding of her right to allocute, and interaction with the court — evidenced her sufficient mental state. Under these circumstances, we can find no error in the court's conclusion

that Reynolds' competency was restored.

Second, with respect to Reynolds' argument that the court was required to cross-examine the psychiatric personnel at Carswell who found Reynolds competent, we have disposed of this argument in our prior case law. As we explained in United States v. Muriel-Cruz, 412 F.3d at 14, the district court does not have an independent duty to summon and cross-examine the experts who determine that a defendant has regained competence. "Subsections 4241(e) and 4247(d) plainly contemplate that the issue of defendant's competency vel non is to be resolved through the normal workings of the adversarial process." Id.

**B. Motion to Suppress**

The Fourth Amendment protects against warrantless searches unless the search comes within "one of the 'few specifically established and well-delineated exceptions' to the warrant requirement." United States v. Forbes, 181 F.3d 1, 5 (1st Cir. 1999) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973)). A consensual search is such an exception. Id. Consent to a search may be express or inferred. United States v. Winston, 444 F.3d 115, 121 (1st Cir. 2006). For consent to be valid, it must also be voluntary. Id. "'The existence of consent and the voluntariness thereof are questions of fact to be determined from all the circumstances surrounding the search.'" Id. (quoting United States v. Miller, 589 F.2d 1117, 1130 (1st Cir. 1978)).

-18-

Voluntariness must be proved by the government, and it is a question of fact that turns on an evaluation of multiple factors, including the consenting party's age, education, experience, intelligence, and knowledge of the right to withhold consent. United States v. Dunbar, 553 F.3d 48, 57 (1st Cir. 2009). Further considerations include whether the party was advised of her constitutional rights or whether the consent was obtained by coercive means. Id.

Reynolds challenges the district court's denial of her motion to suppress the firearms. She argues first that her answer affirming that she had weapons and her gesture towards the headboard did not constitute implied consent. Second, she contends that, to the extent that she did consent to the search, her consent was not voluntary because of her mental infirmities, which the district court should have considered.

When reviewing a challenge to the district court's denial of a motion to suppress, we review factual findings for clear error and accord de novo review to conclusions of law. United States v. Mohamed, 630 F.3d 1, 4-5 (1st Cir. 2010). We will affirm the denial of the motion "'so long as any reasonable view of the evidence supports it.'" Id. (quoting United States v. Bater, 594 F.3d 51, 55 (1st Cir. 2010)). Arguments related to the unlawfulness of a search that were not raised to the district court, however, are considered waived or forfeited and are reviewed

-19-

at most for plain error. See United States v. Genao, 281 F.3d 305, 309 & n.4 (1st Cir. 2002) (finding defendant waived his argument that search was involuntary because he did not raise voluntariness challenge to the district court).

Here, we dispose of Reynolds' challenges. With respect to her first argument, we hold that, although the issue may be debatable, the district court did not clearly err in finding that Reynolds gave the police officer implied consent to search the headboard. It was reasonable for the district court to find that Reynolds' gesture to the headboard when answering "yes" to whether she had weapons demonstrated that Reynolds understood the police officer intended not only to learn of the existence of the weapons, but also to find them. See Winston, 444 F.3d at 121-22 (finding district court clearly erred by concluding that defendant did not impliedly consent to search of nightstand when police officers asked defendant for identification, defendant told them his identification was in the bedroom nightstand, and defendant gestured to nightstand with his shoulder); Genao, 281 F.3d at 309-10 (finding no clear error regarding implied consent to search third floor apartment when defendant volunteered that he had a key to the apartment and showed the police how the key worked).

Next, with respect to Reynolds' claim that the court erred by finding her consent voluntary and by not considering fully her mental competence, we reject it. First, the argument was never

presented to the district court and therefore we apply at most plain error review.  See Genao, 281 F.3d at 309 & n.4.  Although Reynolds claims that the parties "assumed" the district court would consider Reynolds' competency when ruling on the motion, we see no evidence of this, particularly here where the district court specifically asked the parties whether there were additional materials the court should consider before ruling on the motion.

Second, we can find no error.  Mental competency is certainly a factor to be considered when evaluating voluntariness, but it is one of many a court must balance.  See United States v. Watson, 423 U.S. 411, 424-25 (1976); see also United States v. Santos, 131 F.3d 16, 19 (1st Cir. 1997) (finding totality of circumstances indicated confession was made voluntarily even though defendant's competence was a factor in the determination).  Here, the court did consider Reynolds' mental status, but when undergoing its totality of circumstances evaluation, it found that the factor alone did not demonstrate involuntariness.  The court concluded that the search incident was minimally coercive and that there was no evidence that Reynolds was affected by any underlying illness during the time of the search.  Indeed, Reynolds was responsive, lucid, and cooperative with the police officers.  Further, notwithstanding the fact that Reynolds never sought to introduce evidence of her mental health, even if the court had considered the forensic reports and Reynolds' demeanor at subsequent court

proceedings, none of this evidence spoke to Reynolds' mental capacity at the time of the incident.

## C. Sua Sponte Recusal

Section 455 of Title 28 of the United States Code governs judicial recusals and requires that "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). Reynolds argues that because the district court judge presided over the second competency hearing during which Reynolds made admissions of her guilt, the judge could not be impartial when overseeing the bench trial. Specifically, she asserts that because she admitted to possessing the firearms and to knowing that one had an obliterated serial number, the judge had either predetermined her guilt before the trial or predetermined her lack of credibility.

This argument proves too much. Since Reynolds makes this claim for the first time on appeal, plain error review applies, and Reynolds cannot meet the prejudice prong. The parties stipulated to the admission of the second competency hearing transcript, which Reynolds does not now contest, and so any judge presiding over the bench trial would have considered Reynolds' statements made during the hearing. Moreover, opinions formed based on evidence introduced during the course of a case do not per se warrant recusal. Such opinions are "properly and necessarily acquired in

the course of the proceedings, and are indeed sometimes (as in a bench trial) necessary to completion of the judge's task." Liteky v. United States, 510 U.S. 540, 550-51 (1994).

## D. **Jury Trial Waiver**

Lastly, Reynolds claims that her jury-trial waiver was not knowingly and voluntarily executed for two reasons. First, she claims that her mental incompetence prevented her from fully appreciating her right to a jury trial, as demonstrated by her preoccupation with the delay that a jury trial might cause. Second, reformulating her recusal argument, she asserts that her waiver could not be knowing and voluntary because the district court did not explain to her that it had previously heard her admissions related to the charges and would consider these admissions when deciding whether she was guilty.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury." U.S. Const. amend. VI. A defendant, however, may waive this constitutional right. Adams v. United States ex rel. McCann, 317 U.S. 269, 277-78 (1942); United States v. Leja, 448 F.3d 86, 92 (1st Cir. 2006). To effectuate the waiver, there must be "the consent of government counsel and the sanction of the court . . . in addition to the express and intelligent consent of the defendant." Patton v. United States, 281 U.S. 276, 312 (1930); see also Fed. R. Crim. P. 23(a). Whether

-23-

a waiver was knowingly, voluntarily, and intelligently made "depend[s] upon the unique circumstances of each case," Adams, 317 U.S. at 278, including the defendant's personal, express waiver in open court, defense counsel's representations concerning the waiver, the defendant's presence in the courtroom when the waiver was discussed, and the extent of the particular defendant's ability to understand the courtroom discussions regarding jury waiver, see Leja, 448 F.3d at 93-94.

For preserved claims, "[w]e review factual findings by the district court for clear error and the determination of whether a waiver of rights was voluntary de novo." United States v. Frechette, 456 F.3d 1, 11 (1st Cir. 2006) (internal marks omitted). Reynolds did not raise her challenge below and so plain error review arguably applies, but her claim fails under either standard. Cf. Leja, 448 F.3d at 92 (conducting plenary review because of "the significance of the constitutional right at issue," although defendant did not challenge waiver until motion for a new trial).

First, we find no error in the district court's conclusion that Reynolds was sufficiently competent to voluntarily waive her right to a jury trial. Reynolds was found to have regained competence during the second competency hearing, and the district court continued to confirm Reynolds' competence throughout the subsequent proceedings in this case, including during the colloquy wherein Reynolds personally and expressly waived her right

-24-

to a jury trial. Reynolds was present for all discussions concerning the waiver, and, indeed, it was defense counsel who initiated discussions regarding the option. Further, Reynolds confirmed that she preferred a bench trial both implicitly during the change of plea hearing and explicitly when she executed the waiver verbally and in writing before the trial began.

Although Reynolds may have been an unsophisticated defendant, the court clearly articulated the scope of her right to a jury trial, which Reynolds asserted she understood. It explained that her waiver meant that she wanted to proceed before the district court as the judge and jury of the case, and the judge would determine her innocence and guilt. She agreed that she had discussed her right to a jury trial with her defense counsel, along with the advantages and disadvantages of proceeding with one, and her attorney confirmed these discussions. Reynolds stated that she did not need more time to decide the issue and that she read, signed, and understood the waiver. To the extent that Reynolds was concerned with any delay brought on by a jury trial, the district court explained that a jury trial would not necessarily take longer and the timing difference between the two would be a matter of days. Under such circumstances, we cannot conclude that Reynolds' mental capacity undermined her voluntary waiver of a jury trial.

Nor do we find that Reynolds' waiver was involuntary because the district court did not explicitly inform Reynolds that

it would consider the admissions she made during the second competency hearing.  As we have previously held, "The type of information . . . which the defendant must possess in order to make a knowing and intelligent waiver of the right to a jury trial relates to his knowledge of his constitutional rights."  United States v. Kelley, 712 F.2d 884, 888 (1st Cir. 1983) (finding jury trial waiver was valid because defendant was aware of his rights even though judge did not disclose that he had previously authorized an extension of a wiretap on defense counsel).  Here, the district court made clear to Reynolds the nature of the right involved.  It explained the importance of the right and the implications of the waiver.  Nothing more was required.  See id. at 888-89.  Even so, the record demonstrates that the district court did warn Reynolds about her statements.  During the second competency hearing, it cautioned Reynolds against discussing the charges, and Reynolds' counsel informed her that anything she said could be used against her.  We therefore find no error.

### III.  Conclusion

For the foregoing reasons, we affirm the district court's denial of Reynold's motion to suppress, and we affirm Reynold's conviction.

**So ordered**.