# United States Court of Appeals
## For the First Circuit

No. 17-1462

UNITED STATES OF AMERICA,

Appellee,

v.

ROGER BELANGER,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Jon D. Levy, U.S. District Judge]

Before

Howard, Chief Judge,
Lynch and Thompson, Circuit Judges.

Joseph B. Simons for appellant.
Renée M. Bunker, Assistant United States Attorney, with whom
Halsey B. Frank, United States Attorney, was on brief, for
appellee.

May 9, 2018

**THOMPSON**, **Circuit Judge**.  In today's story of why it's generally not a good idea to orchestrate and then participate in an illegal narcotics distribution ring, meet Roger Belanger of Corinna, Maine.  Belanger was indicted on one count of conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine and an unspecified amount of oxycodone, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A), as well as a separate count of using and maintaining a drug-involved premises in violation of 21 U.S.C. § 856(a)(1) and 18 U.S.C. § 2.  After a five-day trial in the District of Maine, a jury of Belanger's peers found him guilty on both counts and he was subsequently sentenced to eleven years imprisonment.  Belanger now comes to us presenting a host of supposed problems he says occurred during the proceedings below.  Having taken a look at Belanger's claims of error, we cannot agree and affirm.

## A. Getting Our Factual Bearings

The conspiracy with which Belanger was involved included at least fifteen or so individual coconspirators and occurred over a timespan of nearly thirteen years.  Thus, to keep things clear, our recitation of what exactly happened in this case does not tarry on the minutiae of each and every interaction Belanger had with his coconspirators.  Instead, we endeavor to lay out in this section a description of how things generally transpired during the course of the conspiracy and opt to fill in, as needed, any

further specificities called for by our analysis later in the opinion. We note that our recitation of the factual background is, of course, done in the light most complimentary to the jury verdict. United States v. Negron-Sóstre, 790 F.3d 295, 307 (1st Cir. 2015).

## 1. The Conspiracy

As charged in the indictment, and as supported by testimony at trial, Belanger's drug conspiracy ring was operational at least as early as 2002. At that time, Belanger owned and operated an automotive mechanic and towing company called Gudroe's. While Gudroe's appears to have functioned as a legitimate business in some respects (i.e., car work was performed by its employees for paying customers), it was also utilized by Belanger as a drug distribution center for the conspiracy. Indeed, some of the employees at Gudroe's were, themselves, coconspirators in the drug ring. John Williams, an employee at Gudroe's, for example, testified that while working there, Belanger would send him on drug runs to Rhode Island where they had a contact who served as the source of the cocaine that was ultimately distributed up in Maine. This contact, who was named "Miguel," would provide the illegal drugs to the designated drug runner and the drug runner would then hide the narcotics in his or her car for transportation back to Maine. The means of hiding the drugs differed--in some cases the drug runner would simply put the drugs in the trunk of

- 3 -

the car, while on other occasions the drugs would be hidden intricately within the vehicle (such as in the gas tank of the car or within hidden panels in the car's interior). The drug runner would then drive back to Gudroe's, where the drugs would be retrieved from the vehicle and given to Belanger (and other coconspirators) to be sold and/or used recreationally. Belanger would, himself, sometimes transport the drugs from Rhode Island, as well.

One of Belanger's subordinates in the drug ring during this time was his daughter, Kelli Mujo. While Mujo initially worked well under Belanger, things seemed to change in 2003. Testimony at trial revealed that Mujo felt duped upon learning that some of the cars she transported from Rhode Island contained a rather high quantity of cocaine. Indeed, upon personally witnessing what a coconspirator described as a "bible-size" amount of cocaine being unloaded from one vehicle, Mujo complained that she was not getting paid enough to transport such a high drug volume. Moreover, Mujo began to gripe about the fact that, in her view, Belanger spent more time in his room getting high than he did fostering the narcotics business. In response, and behind Belanger's back, Mujo contacted David Snow (Belanger's primary business partner) and began directly supplying him with cocaine, as well. In doing so, however, Mujo still acquired this cocaine from the same contact in Rhode Island utilized by Belanger, Miguel.

Nonetheless, Belanger did not stop his drug transportation and distribution business when Mujo began directly supplying Snow. There was testimony from Williams (who also served as a drug dealer), for example, that between 2003 and October 2004, Williams still acquired most of his cocaine from Belanger, Snow, and two other individuals. There was also evidence presented that despite Mujo going behind Belanger's back to work directly with Snow, Belanger and Mujo continued to work together in providing drugs to their joint customers. Joey Burton, a drug addict who bought narcotics from Belanger, testified that during the course of his purchasing cocaine from Belanger in 2003 and 2004 he met Mujo, who would sometimes be present for the transactions. If Belanger was unavailable to distribute his cocaine, he would "pick it up" from Mujo and in some instances he independently purchased the drugs from Mujo.

Sometime later, in 2005, Belanger and his wife moved from Maine to California. Various accounts were given at trial as to why Belanger made the cross-country trek. One coconspirator testified that Belanger justified the move as necessary to "straighten out his life . . . before him or his wife died [from drug overdoses]." That is, "he and his wife were both having some pretty serious problems, and he just wanted to start a new life." Another coconspirator had a different story, however, recounting for the jurors at trial that Belanger had told him the California

- 5 -

move was necessary because "it was getting too hot." According to this account, "[t]he cops was [sic] looking in too close to the drug business."

Regardless of Belanger's true motive for moving to the Golden State, it is undisputed that shortly before he did so, Miguel, the cocaine source in Rhode Island, was arrested. Coconspirator Russell Beckwith testified that immediately following Miguel's arrest, Mujo also ceased participating in the drug business "for a short time." The hiatus, however, was fleeting. Mujo, according to Beckwith, told him soon thereafter that "Miguel hooked her up with one of his boys" and that the drug distribution activities continued. Indeed, there was testimony at trial that in Belanger's absence, Mujo and Mark Tasker assumed the leadership role previously held by Belanger. The testimony revealed that they became the primary facilitators of trips down to Rhode Island to retrieve drugs for distribution in Maine.

In approximately 2009, Belanger returned from California to Maine and jumped back into the drug business with both Mujo and the same general group of coconspirators he had worked with before moving.[1] Michael Thompson--a coconspirator (and Mark Tasker's nephew)--told the jury that upon Belanger's return to Maine,

_____

[1] While there is conflicting testimony regarding when Belanger actually returned from California (ranging from 2008 to 2014), Belanger's attorney conceded at trial (and the trial court accepted the fact) that Belanger could be assumed to have come back in 2009.

- 6 -

Thompson, who had previously purchased drugs from Belanger pre-2005, once again found Belanger to be a reliable drug source. According to Thompson, he had personally witnessed his Uncle Mark obtain drugs from Belanger after Belanger returned to Maine. Greg Tasker, Mark Tasker's son, testified that around 2011 or 2012 he began to purchase cocaine and oxycodone from Belanger and Mujo. He recounted that while he often purchased the drugs from Mujo at her house, there were instances where he purchased the drugs directly from her at Belanger's trailer in Corinna (which Belanger purchased after coming back from California). Greg also noted that it was his impression that when Belanger sold him drugs, Belanger was generally getting them from Mujo. In other words, while Belanger was the primary leader of the drug ring before he left for California, he took a backseat role to Mujo once he returned.[2]

---

[2] There are numerous other examples of Belanger immersing himself back in the drug ring upon his return from California and working closely with Mujo. Though going through each example exhaustively is unnecessary, we provide the reader with one more for good measure. Williams testified that in 2012 or 2013, he and Mujo had a falling out that resulted in Mujo's refusal to directly deal with him or provide him drugs to sell. Undeterred, and in recognition of the link between Belanger and Mujo, Williams explained that he instead approached Belanger, who began to serve as his direct point of contact for cocaine and oxycodone. That said, Belanger received the drugs from Mujo. In fact, Williams rode along with Belanger numerous times to Mujo's home so that Belanger could pick up the drugs that were ultimately passed on to Williams. Mujo, in other words, still served as the ultimate source of the drugs, but Williams was required to pay Belanger directly for the narcotics.

At some point following Belanger's return, the Drug Enforcement Administration ("DEA") obtained successive wiretaps on Tasker's, Belanger's, and Mujo's cellular devices. In doing so, the DEA was able to record numerous conversations discussing the selling, transportation, and hiding of drugs. During these phone calls, the coconspirators did not use the actual names of the drugs they were discussing. This is not shocking. Indeed, it was revealed through testimony at trial that the drugs sold in the conspiracy were rarely (if ever) referred to by their mainstream names. Numerous individuals explained that alternative, identifying lingo was used instead. A drug abuser and dealer, Whitney Chadbourne, for example, testified that 30-milligram oxycodone pills were referred to as "blueberries" or "muffins." Similarly, Williams told the jury that he would never use the terms "cocaine" or "oxycodone." Instead, if he wanted cocaine he would ask for "tires" and if he wanted oxycodone he would ask for "blueberries." He also explained that the term "oranges" was used to refer to suboxone[3] and that "uptown" was another term used to refer to cocaine.[4] Greg Tasker told the jury that he had heard the term "wheels" used in the drug business to refer to "pills" and that he had personally heard both his father, Mark, and

_____

[3] Mark Tasker similarly vouched that suboxone or "Ex 40s" were referred to as "oranges."
[4] Cynthia Williams (John Williams's wife) also called cocaine "uptown" while testifying at trial.

Belanger use that term in the past. And Ross Morrison, another drug addict and dealer in the conspiracy, told the jury that oxycodone was referred to using the code word "blueberry."

Special Agent Paul Buchanan, a 16-year veteran of the DEA who was involved in the investigation of this case, testified to this, as well. Indeed, Buchanan was tasked at trial with providing his layman's interpretation of recordings and transcripts of some of the intercepted calls. He corroborated other witnesses by explaining that it was common for drug dealers to use coded words when referring to drugs (i.e., using the term "blueberries" in reference to oxycodone pills). In addition, he explained to the jury the process the DEA case agents went through to obtain the wiretaps on Belanger's and his coconspirators' phones, as well as his involvement in wiretap investigations generally. And he testified as to common drug terminology and gave his personal impression of what had transpired during some of the phone calls. Side note: Special Agent Buchanan's testimony is of particular importance because, as will be seen in our analysis, Belanger has lodged numerous evidentiary challenges to the admissibility of his testimony about these calls. While the precise nature of the contested calls need not be fleshed out at this juncture, the reader shouldn't fret. We will get into the nitty gritty of Belanger's wiretap qualms momentarily.

Anyway, back to the conspiracy's operations. In

November of 2014, things came to a head for Belanger, Mujo, and the rest of the coconspirators. On November 8, 2014, Belanger's unregistered car was pulled over and police dispatched drug dogs around the vehicle. While nothing was found, Belanger subsequently telephoned Mujo and told her he "put everything in hiding," presumably in reference to drugs, which was picked up by the wiretap. On November 12, 2014, Belanger called Mujo to tell her to "hide [her] stuff" because he had gotten word that cops were "all over" a coconspirator's property. On November 21, 2014, Mujo was pulled over while driving on a Maine highway. She called her son to let him know that a drug dog had "hit on the car" and that "the DEA showed paperwork that they're searching Poppie's [i.e., Belanger's] house and searching my house." And, in fact, that same day warrants were executed on both Belanger's and Mujo's homes in Corinna and Wellington, Maine, respectively. Electronic scales commonly used to measure drug amounts, as well as $6,783 in cash, were found at Belanger's residence, though no drugs were ever actually found (in this raid or subsequently). That said, Belanger later summoned Williams and two other unidentified men to accompany him to Mujo's after the search because he "thought the [DEA] missed the drugs."

Based on much of this evidence, Belanger was indicted on April 16, 2015, and subsequently arrested on April 21, 2015.

## 2. Significant Happenings at Trial

Mujo and Belanger were ultimately tried together. Throughout the proceedings, debate raged over whether Belanger had withdrawn from the conspiracy when he left for California in 2005. This mattered because, according to Belanger, if he did in fact withdraw in 2005, then there were arguably two separate conspiracies--one from 2002 to 2005 and a separate, discrete conspiracy from the time he returned from California in around 2009 until the raid on his house in 2014. Belanger maintained that separating his actions into two distinct conspiracies would necessarily trigger statute of limitations problems for the Government, whereby any drug activity taking place in 2002, 2003, 2004, or 2005 would be ineligible to be counted toward the five-kilogram drug quantity floor required under 21 U.S.C. § 841(b)(1)(A).

Unsurprisingly, the Government disagreed with Belanger's two-conspiracies assessment and his withdrawal-from-the-drug-ring contention. Indeed, it explained to the jury in closing argument that regardless of whether Belanger was away in California for three to five years, his absence from Maine did not, in and of itself, result in a withdrawal from the conspiracy. Using a rather playful analogy, the Government articulated the following:

> [Y]ou need to think of the conspiracy like a train, a train, choo-choo. It starts in 2002, and it travels from Rhode Island to Maine. It travels from 2002 all

the way up to 2014.  And as the train travels along, people get on, people get on that conspiracy train.  They get on the train by willfully joining the understanding.  And once they're on that train and they have that understanding, they're in the conspiracy.  The only way that you can get off that train once you're on it -- well, there's two ways, you can die . . . or you can derail the [t]rain.  Derail the train.  And the way you derail the train is you frustrate efforts of the conspiracy.  You go to the other conspirators, every single one of them and say, I'm out, I'm done, I'm finished, I'm through, I don't want anything else to do with drugs.  You go to the cops.  You go to Special Agent Buchanan and say . . . I want to help you catch the people that I have been dealing with for the past, you know, 10 years, even my daughter.  That's what you do.  You derail the train.  You cannot get off of that train, you cannot get rid of that understanding unless you either die or derail the train.

According to the Government, Belanger neither died nor "derailed the train" and so he never effectively left the conspiracy.

Belanger nonetheless requested at the charge conference that the court issue the following multiple conspiracy jury instruction: "if you find that a conspiracy existed before or as of Mr. Belanger's departure for California in 2005, then a separate conspiracy existed beginning after Mr. Belanger's departure for California in 2005."  After considering Belanger's request, the court denied the proposed instruction, reasoning,

[t]he trial evidence established that one conspiracy operated continuously from at least 2002 to sometime in November of 2014, and that Belanger was active in the conspiracy at times and inactive at other times. . . . Accordingly, there's no factual basis for a finding that there was more than one conspiracy.

The judge then instructed the jury.  He made clear that "[t]he

- 12 -

lawyers may have referred to some of the governing rules of law in their arguments. If any differences appear to you between what the attorneys said and what I say in these instructions, my instructions control." He then noted that,

> to find the defendant guilty of conspiracy, you must be convinced that the Government has proven each of the following things beyond a reasonable doubt, first, that the agreement specified in the indictment existed between at least two people to distribute and possess with the intent to distribute cocaine and oxycodone; and second, that the defendant willfully joined in that agreement.

The judge made sure to point out that "[e]ven if a defendant was not part of the agreement at the very start, the defendant can be found guilty of the conspiracy if the Government proved that he . . . willfully joined the agreement later."

At the end of the jury charge, Belanger objected to the absence of his multiple conspiracy instruction. Additionally he objected to the lack of "an instruction about withdrawal." Although Belanger conceded he never proposed a withdrawal instruction prior to that point, both the Government and the judge were amenable to a withdrawal instruction being given. Indeed, the prosecutor stated, "Your Honor, I did not [previously] understand that [Belanger's counsel] had made this request [for a withdrawal instruction] . . . but he certainly argued [withdrawal] to the jury. I responded. . . . I don't have an objection to the Court giving that instruction."

Moments before sending the jury off for deliberations, the district judge provided Belanger's requested withdrawal instruction. He articulated the following:

> Members of the jury, during the course of closing arguments, you heard reference at times to this idea of withdrawal from a conspiracy. And I want to give you an additional instruction for you to consider in connection with your consideration of Count I in this case, the conspiracy count as it applies to . . . Mr. Belanger. So I am going to instruct you now on what withdrawal from the conspiracy is. To withdraw from a conspiracy, a conspirator must act affirmatively either to defeat or disavow the purposes of the conspiracy either by making a full confession to authorities or by communicating to his coconspirators that he has abandoned the enterprise and its goals.

And with that, the judge sent the jury on its way to the jury room to hash it out and arrive upon a verdict.

### 3. Sentencing

As we know, the jury found Belanger guilty on both charged counts. Following his conviction, the Probation Office for the District of Maine was tasked with preparing a presentence investigation report ("PSR"). Based on evidence presented at trial, probation calculated Belanger's guidelines base offense level to be 32. Because Belanger maintained his house and garage for purposes of distributing narcotics, a two-level increase on the base level was imposed pursuant to U.S.S.G. § 2D.1.1(b)(12). Another four-point increase was added under U.S.S.G. § 3B1.1(a) because Belanger was determined to be a leader or organizer of a criminal activity that involved five or more persons. Thus,

Belanger's total offense level ("TOL") was found to be 38. Despite ten previous convictions, Belanger was determined to have zero criminal history category ("CHC") points and so he was given a CHC of I. With a TOL of 38 and a CHC of I, Belanger's guidelines sentencing range was calculated to be 235-293 months imprisonment.[5]

Belanger objected to the PSR for two reasons. First, he argued that probation's reliance on the testimony of two specific witnesses in calculating the quantity of drugs he distributed (and thus his base offense level) was misplaced. Specifically, he maintained that the two "problem" witnesses gave inconsistent testimony and so could not be relied upon.[6] Second, Belanger objected to the four-point leader or organizer enhancement to his total offense level, arguing that his pre-2005 criminal activity was part of a second, distinct conspiracy and thus his behavior in that conspiracy was irrelevant to sentencing. Concomitantly, he argued that his behavior upon his return to Maine did not rise to the level of leader or organizer such that an enhancement was

_____

[5] The PSR reveals that two of Belanger's prior convictions were for operating a motor vehicle on a suspended license, which is excluded from criminal history calculations under U.S.S.G § 4A1.2(c)(1). All of Belanger's remaining previous convictions occurred more than fifteen years prior to Belanger's commencement of the instant offenses. As such, they were not counted for purposes of computing his criminal history pursuant to U.S.S.G. § 4A1.2(e)(3).

[6] These witnesses, anonymized for the purposes of our record here, were referred to by the parties as SI-4 and SI-5 (or Sources of Information 4 and 5).

warranted.

The district court overruled both objections.  As to the reliability of the witnesses, the court explained that the witnesses had been "subject to cross-examination, . . . credibility was tested, and I am comfortable relying upon that testimony and concluding by a preponderance of the evidence the drug quantity to which . . . [the] trial testimony was the source of."  As for the leadership or organizer increase, the court noted that

> Belanger organized this drug conspiracy in 2002 and led it until he departed for California sometime in 2004 or 2005.  Further, the trial evidence was that he returned from California in 2009 and thereafter functioned essentially as a manager of the . . . conspiracy, assisting his daughter, Kelli Mujo.  The four-level enhancement pursuant to 3B1.1 is justified in this case even though the defendant did not exercise continuous leadership over the conspiracy.  He had at the beginning exercised at least some degree of leadership and organizational control over others."

Having rejected each of Belanger's objections, the court then imposed its sentence.  Though the guidelines range was, as mentioned above, 235-293 months, the court departed downward, imposing only a concurrent 132-month term of imprisonment for both counts of conviction.  In imposing this significantly lesser punishment, the court explained:

> I would like to be clear that the sentence that I have just announced is the same sentence I would impose . . . if I had granted one or more or all of the objections that the defendant has made regarding the sentencing guidelines in this case. Under the Section 3553 factors, in my view, separate from the guidelines consideration, the sentence that I have announced of 132 months is just

and fair.

And with that, having laid out the travel of this case, we are at long last ready to jump into Belanger's issues on appeal.

## B. Analysis

Belanger's appeal concerns itself with five discrete issues: first, the district court's allowance under Federal Rule of Evidence 701 of Special Agent Buchanan's interpretative testimony of various wiretapped calls; second, the Government's supposed failure to present sufficient evidence to prove that Belanger was involved in the conspiracy charged in the indictment; third, the district court's refusal to give Belanger's proposed jury instruction regarding multiple conspiracies; fourth, the Government's supposed mischaracterization of the law regarding withdrawal in its closing statement; and, finally, the district court's alleged error in calculating Belanger's sentence. We address each one by one, knocking them out as we go.

## 1. Special Agent Buchanan's Lay Opinion Testimony

We begin with Belanger's contention that Special Agent Buchanan's testimony about the wiretapped calls was improperly admitted under Rule 701. Belanger's precise objections to the testimony are hard to pin down but, in general, it seems he believes that numerous calls that Buchanan was allowed to testify about contained vague language and that no proper foundation was laid for Buchanan to credibly assess what was happening in those

calls (i.e., whether drugs or conspiracy-related activities were being discussed). Furthermore, Belanger contends that, at times, Buchanan was given carte blanche to interpret otherwise commonsense (i.e., plain English) recordings and that such testimony had no independently useful value to the jury. These supposed violations of Rule 701, Belanger tells us, were unduly prejudicial and thus warrant a new trial.

We note that, in his briefing, Belanger lobs rather lofty, general grievances at the admission of Buchanan's testimony. But we can identify only four, particularized calls that are referenced with even slight specificity (details of these calls are coming shortly). We thus deem any claims outside of these four calls forfeited. See United States v. Albertelli, 687 F.3d 439, 448-49 (1st Cir. 2012). Moreover, of the four phone calls at issue, Belanger objected below to Buchanan's testimony as it pertained to only one of them. Thus, though that one preserved objection is reviewed for abuse of discretion, see United States v. Valdivia, 680 F.3d 33, 50 (1st Cir. 2012), the three remaining unpreserved evidentiary challenges are reviewed for plain error only, see United States v. Etienne, 772 F.3d 907, 913 (1st Cir. 2014). "This is a difficult hurdle to vault: plain error review exists to correct 'blockbusters,' not 'the ordinary backfires . . . which may mar a trial record.'" United States v. Madsen, 809 F.3d 712, 717 (1st Cir. 2016) (quoting United States v. Griffin,

- 18 -

818 F.2d 97, 100 (1st Cir. 1987)).  Indeed, to demonstrate plain error, an appellant like Belanger must show "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings."  United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001).

Before we get down to the brass tacks of the four phone calls, we pause to give some background on Rule 701, which reads as follows:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
>
> **(a)** rationally based on the witness's perception;
>
> **(b)** helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
>
> **(c)** not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701.  In articulating how we review evidentiary challenges under this rule, we have made it quite clear that a district court has a vantage point far superior to our own when it comes to the happenings and details of a particular case.  As such, we afford it "considerable discretion" in deciding whether lay opinion testimony is admissible under Rule 701.  Valdivia, 680 F.3d at 51.  That said, we have nonetheless explained that "where [a] witness is no better suited than the jury to make the judgment

- 19 -

at issue," the testimony must be excluded.  United States v. Vázquez–Rivera, 665 F.3d 351, 363 (1st Cir. 2011)(quoting United States v. Meises, 645 F.3d 5, 16 (1st Cir. 2011)).  This "provid[es] assurance against the admission of opinions which would merely tell the jury what result to reach."  Id.  Such testimony, in other words, would be superfluous and would thus be inimical to Rule 701.

When it comes to Rule 701's application in the drug-trafficking context in particular, "we have long held that government witnesses with experience in drug investigations may explain the drug trade and translate coded language" through lay opinion testimony under Rule 701.  United States v. Rosado–Pérez, 605 F.3d 48, 56 (1st Cir. 2010).  This makes sense.  Indeed, "[t]ime and again we have stated that Rule 701 lets in 'testimony based on the lay expertise a witness personally acquires through experience, often on the job.'"  United States v. George, 761 F.3d 42, 59 (1st Cir. 2014) (quoting United States v. Santiago, 560 F.3d 62, 66 (1st Cir. 2009)).  And understanding, interpreting, and translating purposefully confusing drug lingo is just that--a skill picked up and fostered by a law enforcement officer on the job.  While we acknowledge this may not be the "most traditional lay opinion," such testimony "formally meets the requirements of Rule 701, being rationally based on [a law enforcement officer's] perception of the conversations; helpful in the Rule 701 sense

broadly understood; and yet not based on expert knowledge within the meaning of Rule 702." Albertelli, 687 F.3d at 447 (internal quotations omitted).

### a. Call #1757

We turn to the first of the four calls with which Belanger takes issue--a call between Belanger and Mark Tasker in which Tasker asked Belanger whether he "had any of that good stuff yet." After playing the call for the jury, the Government asked Special Agent Buchanan "[w]hat are they talking about there?" Buchanan responded, "I interpret that as Mr. Tasker asking Mr. Belanger if he's got any good cocaine or cocaine of good quality." Belanger immediately objected (which is why, as noted above, we review this preserved claim of error for abuse of discretion), arguing that proper foundation had not been laid for Buchanan to opine on his personal interpretation of the call. The district judge initially sustained the objection, but provided the Government with the opportunity to establish foundation. And establish it did.

First, the Government elicited that Special Agent Buchanan had been, at the time of trial, employed by the DEA for approximately sixteen years and that his primary responsibility during that time had been working on illegal narcotics investigations. Moreover, Buchanan testified that he was a case agent on this particular matter. As a case agent investigating

Belanger, Mujo, and their cohort, Buchanan was not only involved in obtaining the wiretap authorization warrants necessary for him and his team to monitor Belanger's phone calls, but he was also involved in listening to the thousands of calls as they came in. He even conducted physical surveillance of various individuals during the course of his investigation in this case. Buchanan testified that through such activities he became intimately familiar with the ins and outs of the conspiracy, including the cast of characters involved.[7]

Buchanan also explained that based on his training and experience with the many wiretaps conducted throughout his career, drug dealers almost always used "veiled language" when discussing drugs on the phone. He pointedly noted that "[y]ou don't hear drug dealers say cocaine on the telephone or oxycodone or the name of the drug itself. They'll . . . often use a code word that both the parties understand. . . ." He then provided examples, explaining that he had encountered drug traffickers using terms like "lobster," "up or down," "wheels or tires," "fruits," "apples," and "blueberries" to reference drugs. "As long as both

_____

[7] Indeed, Buchanan explained that, over the course of listening in on wiretaps, "you get to know . . . the folks involved in the case, and you get to know . . . who's breaking the law and . . . who is not." Because of this familiarity, agents like him are able to quickly decipher whether the phone calls being monitored are relevant (and thus require continued listening) or whether they are mundane and inconsequential (thus allowing an agent to hang up).

parties understand," Buchanan pointed out, "it doesn't matter what the word is."[8]

As for the terminology used in this specific call ("that good stuff") Buchanan testified that based on his dealings with cocaine, there is a recognized difference between good cocaine (cocaine that is purer and more potent) and bad cocaine (cocaine that is "cut" with non-cocaine substances like baking soda, thus making it of poorer quality).  Based on this knowledge, coupled with the fact that drug traffickers do not use the proper names of the drugs they sell, he rationally concluded that the term "that good stuff" was a reference to pure, non-cut cocaine.

After the Government provided this foundation, Belanger nonetheless objected that it was still not enough.  This time, however, he was overruled by the court.  We agree with the lower court here.  Indeed, the challenged testimony fulfills all of Rule 701's requirements for admissibility to be sustained.  Agent Buchanan's testimony was (1) logically connected to the extensive experience Buchanan had not just in his field, but in this case in particular, (2) most certainly helpful to serving the jury in their understanding of the drug trade and what Belanger and Tasker were talking about in this conversation, and (3) not based upon

---

[8] And remember that numerous other witnesses involved in the conspiracy corroborated Buchanan's assessment on this point.  See supra Part A.1.

specialized knowledge within the scope of Rule 702.  That is all that is needed.  See United States v. Dunston, 851 F.3d 91, 97 (1st Cir. 2017) ("Where malefactors try to mask their criminal activities by using codes, a law enforcement officer who is equipped by knowledge, experience, and training to break those codes can help to inform the factfinder's understanding."); Albertelli, 687 F.3d at 447 (explaining that under Rule 701, testimony is admissible where it "undoubtedly ha[s] a potential to help the jury").  As such, we conclude that no abuse of discretion can be gleaned and that the testimony was admissible.

### b. Call #1056

The second call we need to address centers around Mark Tasker's statement to Belanger that he "just need[s] a couple of them wheels."  Buchanan's interpretation of "wheels," a term he described at trial as referring to "drugs," forms the crux of Belanger's problem here.  At trial, Buchanan conceded that he could not precisely identify what drug the term "wheels" referred to (i.e., cocaine or oxycodone).  Because of this, Mujo's attorney objected that the testimony was mere "speculation," particularly since Belanger owned an automotive mechanic and towing company and there was nothing to indicate that this particular conversation definitively referenced drugs as opposed to, say, actual car wheels that would be commonplace at a car maintenance shop.  The district court partially sustained the objection, telling the jury that it

- 24 -

could not utilize Buchanan's testimony to deduce what "wheels" meant in this specific exchange, but that it could take into consideration Buchanan's testimony that "wheels" is a term often used by drug traffickers to refer to drugs. Belanger now appears to want to latch onto Mujo's objection, arguing that the district court overstepped its bounds by permitting Buchanan to testify about what "wheels" meant. The argument is, once again, unsuccessful.

First, we note that despite Mujo's objection, we nevertheless review this claim for plain error since individual defendants in a joint criminal trial are required to raise their own objections unless the district court "specifically states that an objection from one defendant will be considered an objection for all defendants." United States v. Leon-Delfis, 203 F.3d 103, 113 (1st Cir. 2000). Given that the court never gave such a directive, plain error review is appropriate. Second, although the admission of this testimony straddles the line between what is acceptable opinion testimony by a lay witness (and what is more properly considered expert testimony) because there was a question as to whether "wheels" might actually have meant tires, we cannot conclude that the judge's ruling below met the plain error threshold. At minimum, Buchanan's robust career most certainly gave him the background to surmise what the term "wheels" generally meant in light of the numerous drug trafficking investigations he

had conducted in his sixteen years on the job. Moreover, Buchanan acknowledged in front of the jury that there could, indeed, be alternative interpretations of the term "wheels." On cross-examination, Belanger's counsel directly asked Buchanan whether "it's possible that wheels in this case, that they actually were wheels, they could have been car wheels, that's a possibility?" Buchanan responded, "[a]nything is possible, but based on my experience this was clearly a drug-related conversation." (emphasis added). Under Rule 701, "[w]here such alternatives can be offered, the plausibility of the witness' own position--unlike, say, that of a medical expert--is readily measured by the jury," and we thus err on the side of deference to the district judge's discretion. Albertelli, 687 F.3d at 448; see also Dunston, 851 F.3d at 97 (explaining that subjection to cross-examination creates an "additional safeguard" to "mitigate[] any risk of unfair prejudice from [Rule 701] testimony").

And, just to add a touch of salt to the wound here, Greg Tasker testified at trial about this specific call and explained that not only did he recognize his father's and Belanger's voices in the recording, but that from his involvement in the conspiracy, he was aware that "wheels" meant "pills" because he had heard both his father and Belanger use that term in the past. Thus, even if the district court committed a "clear or obvious" error, Belanger would be unable to show that it prejudiced him in light of Greg

Tasker's independent, corroborating testimony on the same issue. As such, the admission cannot be said to have affected Belanger's substantial rights.

### c. Call #750

Next, Belanger seems to take issue with Buchanan's testimony interpreting the following conversation between Belanger and Corey Pomerleau, a coconspirator:

Pomerleau: Well, I could probably meet you in Newport

Belanger: Yea.

Pomerleau: Yea why don't I do that, that would work.

Belanger: Yea meet at Wal Mart

Pomerleau: Um ok, what are they a piece?

Belanger: Huh?

Pomerleau: How much are they a piece?

Belanger: Uh they're 35.

Pomerleau: Alright.

Belanger: I got to pay $31 for them so.

Pomerleau: No, I know, I know, alright let me call and see, let me give you a call right back.

The Government asked Special Agent Buchanan, "what's going on in this conversation?" and Mujo objected (again, not Belanger), arguing that Buchanan was being asked to interpret what was otherwise plain English given that, at that point in the trial, the jury was "well educated" as to the topic of conversation: the

price point for 30-milligram oxycodone pills.  The objection was overruled.  The court accepted the Government's explanation that while numerous other witnesses had testified as to transactions involving "30s," Agent Buchanan lent "a certain amount of knowledge from his training and experience about how these deals are set up, [and] how much these pills cost, what kind of . . . a profit that [Belanger] makes off them."  And, in fact, Buchanan testified to just that.  He explained that the "pieces" being discussed were oxycodone pills; that Belanger was explaining that he had to pay $31 per pill and that he then would sell them for $35; and that $35 was--at the time--a typical price per pill for 30-milligram oxycodone pills.

Belanger now wants to push the exact same objection Mujo made at trial--that Buchanan's testimony was inappropriate because he was called on to do nothing more than interpret plain English statements.  We note that, again, because Belanger did not independently object to the testimony at trial, he is merely entitled to plain error review.  Leon-Delfis, 203 F.3d at 113. And we see nothing to warrant a plain error finding.  Not to belabor the point, but all Rule 701 requires is that the testimony in question be "'rationally based on the perception of the witness,' [is] 'helpful to . . . the determination of a fact in issue,' and [is] 'not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.'"  Santiago,

- 28 -

560 F.3d at 66 (quoting Fed. R. Evid. 701). And Buchanan's testimony here fits perfectly within that scope. Terms like "piece" and vague statements like "[u]h they're 35" are not the type of lingo that we would label as "plain English." Buchanan's perception of the conversation thus had the potential to be at least minimally helpful to the jury in understanding the drug transaction being discussed in this phone call and that is all that is needed for it to be admissible. See Santiago, 560 F.3d at 66 (explaining that trooper's lay testimony was admissible where it "merely explained circumstantial evidence from which the jury could have drawn the obvious inference that the gun was there to protect the stockpile of drugs").

### d. Call #453

In the final contested call, Williams asked Belanger if Belanger would be able to "drop 10 off, Donnie could move them today." In reply, Belanger explained that "no" he could not because "the guy is trusting me" and would be "checking . . . to make sure I don't fuck up and once I got his trust I'll have them." The Government asked Special Agent Buchanan "[w]hat's he referring to there?" and Buchanan explained that the "drop 10 off" comment referred to the oxycodone pills Williams wanted and that Belanger's reply about a "guy . . . trusting me" referenced a new secondary supplier Belanger had found with whom he wanted to establish trust before fronting Williams drugs. Though Belanger apparently had no

- 29 -

problem with this testimony at trial and did not object (thus subjecting him to plain error review) Belanger now views this explanation as a no-no, insisting it constitutes "complete interpretations of calls, where it was not necessary for the jury to determine what was being discussed in the calls." We disagree. In our independent read of the conversation--that is, without the benefit of Buchanan's testimony--it is far from clear exactly what Belanger and Williams are discussing. To say that Special Agent Buchanan's "understanding of the oblique statement[] in th[is] wiretap[] might be 'helpful' to the jury," would be an "understatement." Albertelli, 687 F.3d at 447. Phrases like "drop 10 off" are certainly not common knowledge to members of the everyday public and, at the risk of sounding like a broken record, we note again that Buchanan was intimately involved in the investigation of this particular drug conspiracy and was therefore well suited to contextualize individual affairs like this phone call. No error--plain or otherwise--can be detected here.

## 2. One Conspiracy, Two Conspiracies?

But wait. Regardless of whether Special Agent Buchanan's testimony was properly admitted, Belanger tells us that there was nonetheless a dearth of evidence to support his conspiracy conviction as charged in the indictment. Specifically, Belanger argues that the evidence presented at trial proved he affirmatively withdrew from the conspiracy when he advised his

- 30 -

coconspirators of his move from Maine to California in 2005 and that his behavior upon returning to Maine thus constituted a separate, distinct conspiracy. In other words, Belanger contends that there existed a variance between the crime charged in the indictment and the crime that the Government proved. In light of this, Belanger contends that the district court erred in denying his motion for an acquittal pursuant to Fed. R. Crim. P. 29. It now falls on us to "determine whether such a variance occurred and, if so, whether it adversely impacted the appellant's substantial rights." United States v. Fenton, 367 F.3d 14, 18 (1st Cir. 2004). Regrettably for Belanger, however, we find his argument here to be fruitless, concluding instead that the evidence presented by the Government more than proved its case concerning the existence of a single, overarching conspiracy.

To begin, "[w]hether evidence shows one or many conspiracies is a question of fact for the jury and is reviewed only for sufficiency of the evidence." United States v. Niemi, 579 F.3d 123, 127 (1st Cir. 2009) (citing United States v. David, 940 F.2d 722, 732 (1st Cir. 1991)). And a motion for judgment of acquittal on sufficiency grounds is, of course, subject to de novo review. United States v. Cruz-Rodriguez, 541 F.3d 19, 26 (1st Cir. 2008). We have previously explained that in engaging in this sort of review, "we examine the evidence--direct and circumstantial--as well as all plausible inferences drawn

- 31 -

therefrom, in the light most favorable to the verdict, and determine whether a rational fact finder could conclude beyond a reasonable doubt that the defendant committed the charged crime." United States v. Wyatt, 561 F.3d 49, 54 (1st Cir. 2009) (citing Cruz-Rodriguez, 541 F.3d at 26). We do not "weigh the evidence or make credibility judgments; these tasks are solely within the jury's province." United States v. Hernández, 218 F.3d 58, 64 (1st Cir. 2000) (citing United States v. Ortiz, 966 F.2d 707, 711 (1st Cir. 1992)).

And when it comes to evaluating whether a single conspiracy existed (as opposed to two), we are clear to "consider the totality of the circumstances, paying particular heed to factors such as [1] the existence of a common goal, [2] evidence of interdependence among the participants, and [3] the degree to which their roles overlap." Fenton, 367 F.3d at 19 (citing United States v. Portela, 167 F.3d 687, 695 (1st Cir. 1999)). Here, all three of those factors support the Government's contention (and the jury's conclusion) that Belanger was guilty of the charged, single conspiracy.

From the beginning of the charged conspiracy in 2002 all the way up until the conspiracy's conclusion in 2014, the evidence certainly supported the notion that the individuals involved in this conspiracy shared a clear goal: the distribution of drugs (cocaine and oxycodone, to be exact) throughout Central Maine.

- 32 -

This goal was supported by the stealthy transport of the drugs from Rhode Island up to Maine in compartments within various vehicles. This very particular *modus operandi* existed from the beginning of the conspiracy until its end and thus we have no problem checking off factor number one.

As for the overlap and interdependence among the various coconspirators, evidence supporting both factors is quite apparent. Indeed, there was testimony that as early as 2002, Belanger relied on a number of individuals (e.g., Williams, Mujo, Tasker, and others) to drive down to Rhode Island to his drug source, Miguel, and then transport cocaine and oxycodone (hidden intricately within vehicle spaces, mind you) back up to Maine. There was evidence that when Miguel was arrested, he was able to "hook[] [Mujo] up with one of his boys" who then replaced him as the Rhode Island drug source for the conspiracy. Multiple coconspirators testified about their trips down to Rhode Island and how the drugs were subsequently unpacked by Belanger, Mujo, or other coconspirators once they arrived back up to Maine. Testimony also revealed that the members of the conspiracy used common terminology among one another when referencing the illegal contraband they were selling. Coconspirators at trial told the jury that the group often used common terms like "muffins," "blueberries," "uptown," "oranges," and "wheels" to refer to specific types of drugs, lending credence to the fact that the

- 33 -

members of this conspiracy were acquainted enough with one another to talk the coded talk. See Niemi, 579 F.3d at 127 (explaining that evidence coconspirators "used the same code words for drugs" suggested the existence of one conspiracy, rather than multiples conspiracies).

There was further evidence that Mujo and Belanger often supplied the same people with the same sorts of drugs. Greg Tasker, for example, told the jury that upon Belanger's return from California, Greg purchased drugs both from Mujo at her house and Belanger at his trailer. He further noted that it was his impression that Belanger received his drugs from Mujo. And when Williams had a falling out with Mujo (such that she refused to directly supply him with narcotics), he quickly turned to Belanger for his drug fix. Belanger, in turn, got those drugs from Mujo. And, finally, the interdependence among the coconspirators was particularly highlighted given the familial relationships that permeated the conspiracy. Belanger and Mujo--father and daughter--served as leaders of the group; Mark Tasker and his son Greg both assisted in the buying, selling, and transportation of contraband; John Williams and his wife, Cynthia, were also members of the conspiracy; and Michael Thompson, another seller and user of drugs in the conspiracy, was the nephew of both Mark Tasker and John Williams. While it is true that "[a] group may engage in a single conspiracy even if they are somewhat loosely related," id., and

that "the proof need not show that each conspirator knew of all the others, nor that the group remained intact throughout the duration of the enterprise," Fenton, 367 F.3d at 19, here, the coconspirators not only knew generally of one another, but in many cases were related to one another. Without a doubt, factors two and three (interdependence and overlap) are satisfied.

Belanger appears to disagree with this analysis, contending that two discrete events should alter our outcome. First, Belanger reminds us that prior to his move to California, Mujo went behind his back and began to supply Belanger's primary business partner, David Snow, with cocaine unbeknownst to Belanger. This betrayal, Belanger seems to tell us, amounts to behavior representative of a separate conspiracy. Second (as mentioned above), Belanger argues that when he moved to California in 2005, he affirmatively withdrew from the conspiracy by not just informing his coconspirators that he wanted to remove himself from the drug trade and start a better life, but by also fully discontinuing his involvement in the group's drug trafficking and prohibiting his drug supplier, Miguel, from assisting his former coconspirators. Neither of Belanger's contentions holds water.

As to Belanger's first point, the fact that Mujo went behind Belanger's back and independently approached Belanger's partner, Snow, for business does nothing to suggest to us that some alternative conspiracy thereby formed. Multi-member drug

- 35 -

conspiracies like the one here are complex entities comprised of a group of criminals decidedly working in tandem to accomplish some unlawful goal--here, drug trafficking.  It is not far-fetched to assume that shifting alliances and spouts of deception among members of such a group would be par for the course and, importantly, would not necessarily undermine the overarching goals of the conspiracy.  We cannot accept, therefore, Belanger's contention that one large conspiracy should be severed into multiple smaller ones solely based on changes of allegiances among coconspirators so long as there is evidence the larger conspiracy has not ended and the defendant has not withdrawn from that conspiracy.  This is particularly so where, as here, Mujo's supposedly deceptive act did not fundamentally change any aspect of the conspiracy's operational activities.  Indeed, not only did Mujo utilize the exact same drug source that Belanger used in Rhode Island, but she also then sold and supplied the drugs to essentially the same cast of characters up in Maine that her father did.

Belanger's second argument--that he withdrew from the conspiracy by moving to California in 2005--is equally unavailing. "Withdrawal is a demanding defense requiring affirmative evidence of an effort to defeat or disavow the conspiracy."  United States v. Ngige, 780 F.3d 497, 504 (1st Cir. 2015) (quoting United States v. Potter, 463 F.3d 9, 20 (1st Cir. 2006)); see also United States

- 36 -

v. Ciresi, 697 F.3d 19, 27 (1st Cir. 2012) (explaining that the standard for withdrawal is "'strict' and not easily met" (quoting United States v. Juodakis, 834 F.2d 1099, 1102 (1st Cir. 1987))). Indeed, "[w]hen coconspirators refrain, for a period of time, from engaging in drug transactions, this does not, in and of itself, constitute termination or abandonment of the conspiracy." United States v. Mangual-Santiago, 562 F.3d 411, 423 (1st Cir. 2009). While Belanger tells us that he "affirmatively withdrew from the conspiracy," he does not meaningfully back his assertion up with any factual evidence from the record. True, there was testimony from one coconspirator that the move out West was motivated in part by Belanger's desire to "straighten out his life . . . before him or his wife died [from drug overdoses]." But there was competing testimony from another coconspirator that Belanger moved because "it was getting too hot," and, "[t]he cops was [sic] looking in too close to the drug business." Statements disavowing a conspiracy must be unambiguous, clearly evincing a "change of heart or abandonment." United States v. Arboleda, 929 F.2d 858, 871 (1st Cir. 1991). And here, the competing accounts of why Belanger relocated to California suggest that neither Belanger's move nor his communications about the move conveyed with sufficient clarity that he intended to repudiate or abandon the conspiracy. See Ciresi, 697 F.3d at 27-28 (statements like "seems like he doesn't want nothin doin'" and that defendant was "out" were too

- 37 -

ambiguous to claim withdrawal). Not only that, but upon Belanger's return to Maine, he jumped back into the drug trade with the same troop of caballers with whom he had worked prior to moving to California. The evidence thus reasonably supported the inference that when Belanger came back to the Pine Tree State, he furthered the ongoing conspiracy and its continuity of operations (with, we note, the new drug source) by reimmersing himself into the drug trade with both his daughter and his previous associates.[9]

Additionally, there is nothing in the record to support Belanger's contention that he "did not allow his connection to the supply of drugs [i.e., Miguel] to be used by his coconspirators . . . to maintain the conspiracy [while he was away in California]." The record is devoid of anything that would suggest Belanger attempted to implement such preventative measures.

Onward.

### 3. Belanger's Requested "Multiple-Conspiracy" Jury Instruction

Related to the just above discussion, Belanger also tells us that the district court erred when it denied his requested "multiple-conspiracy" jury instruction. We review a court's decision not to issue a requested jury instruction for abuse of

---

[9] At oral argument, we asked counsel if, hypothetically, Belanger had moved away to California under the same circumstances (i.e., all else being equal) and was never heard from again, could we appropriately conclude that he had, in effect, withdrawn from or abandoned the ongoing conspiracy in Maine. Our analysis here does not shed light on this legally distinct (but important) question.

discretion and only reverse if the proposed instruction is "(1) substantively correct; (2) was not substantially covered in the charge actually delivered to the jury; and (3) concern[ed] an important point in the trial so that the failure to give it seriously impaired the defendant's ability to effectively present a given defense." United States v. González-Pérez, 778 F.3d 3, 15 (1st Cir. 2015) (quoting United States v. González-Soberal, 109 F.3d 64, 70 (1st Cir. 1997)). Here, Belanger asked the following to be read to the jury:

> The government has the burden of proving that only one overall conspiracy existed as opposed to separate and independent conspiracies. If you find that a conspiracy existed before 2005, and a separate conspiracy existed after 2005, then you must determine whether the government has proven beyond a reasonable doubt that the Defendants conspired to distribute and possess with intent to distribute . . . cocaine and oxycodone in the later conspiracy. If you find that the government has proven the Defendants' participation in the later conspiracy beyond a reasonable doubt, then you must determine (1) the amount of cocaine the government has proven beyond a reasonable doubt was involved in the later conspiracy, *and* (2) the amount the government has proven beyond a reasonable doubt that each Defendant's conduct in the later conspiracy involved.

(emphasis in original). Quoting United States v. Brandon, Belanger tells us that the point of this particular instruction was to address his "main concern . . . that [without the instruction] jurors [could have been] misled into attributing guilt to [Belanger] based on evidence presented against others who were involved in a different and separate conspiratorial scheme." 17

- 39 -

F.3d 409, 450 (1st Cir. 1994). He further claims that the risk of "evidentiary spillover" from the actions of his codefendants to him was high and that the proposed instruction was vital to avoid any miscarriage of justice that might have resulted from that "spillover." Not so.

Though we recognize that "a court should instruct on the issue [of multiple conspiracies] 'if, on the evidence adduced at trial, a reasonable jury could find more than one such illicit agreement, or could find an agreement different from the one charged,'" United States v. Balthazard, 360 F.3d 309, 315 (1st Cir. 2004) (quoting Brandon, 17 F.3d at 449), here, Belanger's supposed concern is one that was substantially alleviated by the instruction actually proffered by the trial court. Indeed, the court told the jury:

> For you to find the defendant guilty of conspiracy, you must be convinced that the Government has proven each of the following things beyond a reasonable doubt, first, that the agreement specified in the indictment and not some other agreement or agreements existed between at least two people to distribute and possess with intent to distribute cocaine and oxycodone; and second, that the defendant willfuly joined in that agreement.

(emphasis added). That is, the court was clear that the jury could not find Belanger guilty if it determined that the agreement(s) proved by the Government at trial did not match the agreement specified in the original indictment. We have given our blessing time and time (and time) again to this exact same instruction (or

- 40 -

ones nearly identical to it) when defendants have complained that they were entitled to a multiple-conspiracy charge. See United States v. Walker-Couvertier, 860 F.3d 1, 16 (1st Cir. 2017) (explaining in a situation with the same instructions that "[t]hese instructions made pellucid that the government had to prove not only that an overall conspiracy existed but also that [defendant] was a part of it. If the jurors entertained any reasonable doubt that [defendant] was a part of the conspiracy charged, the instructions told them that they must acquit. These clearly articulated instructions protected [defendant] from any prejudice"); Niemi, 579 F.3d at 125–27 (same); Balthazard, 360 F.3d at 315–16 (same). And we may not depart from such clear precedent. Moreover, we have previously explained that "[f]ailure to include superfluous language is not an error," and here the requested instruction would serve no legally meaningful purpose beyond what was already covered by the original instruction. Franchina v. City of Providence, 881 F.3d 32, 56 (1st Cir. 2018). We thus disagree with Belanger regarding the worth he attributes to his proposed instruction, and instead conclude that the judge did not abuse his discretion in refusing to give it. We move on.

#### 4. The Prosecutor's Closing Argument

Belanger's next beef with the proceedings below focuses on what he perceives as an inappropriate closing argument on the part of the Government. As he tells it, the prosecutor's use of

a train analogy to explain the legal concept of withdrawal misstated the law and was so prejudicial as to constitute reversible error. Not just any error, but plain error. You see, Belanger did not object to the statement in question during trial and so plain error must be the lens through which we review his claim here. See United States v. Hansen, 434 F.3d 92, 101 (1st Cir. 2006). To remind, under plain error Belanger must show us that "(1) an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." Duarte, 246 F.3d at 60. And we have added a caveat to this standard, noting that reversal is only appropriate if, given the totality of the circumstances, the contested prosecutorial conduct "so poisoned the well that the trial's outcome was likely affected." United States v. Henderson, 320 F.3d 92, 107 (1st Cir. 2003) (quoting United States v. Sepulveda, 15 F.3d 1161, 1188 (1st Cir. 1993)). That's a rather tough sell, one that requires us to consider the following: "(1) the severity of the prosecutor's misconduct, including whether it was deliberate or accidental; (2) the context in which the misconduct occurred; (3) whether the judge gave curative instructions and the likely effect of such instructions; and (4) the strength of the evidence against the defendants." United States v. Wihbey, 75 F.3d 761, 772 (1st Cir. 1996). We cannot say

Belanger has cleared this threshold.

Remember, the specific train analogy used by the prosecution at trial was the following:

> [Y]ou need to think of the conspiracy like a train, a train, choo-choo. It starts in 2002, and it travels from Rhode Island to Maine. It travels from 2002 all the way up to 2014. And as the train travels along, people get on, people get on that conspiracy train. They get on the train by willfully joining the understanding. And once they're on that train and they have that understanding, they're in the conspiracy. The only way that you can get off that train once you're on it -- well, there's two ways, you can die . . . or you can derail the [t]rain. Derail the train. And the way you derail the train is you frustrate efforts of the conspiracy. You go to the other conspirators, every single one of them and say, I'm out, I'm done, I'm finished, I'm through, I don't want anything else to do with drugs. You go to the cops. You go to Special Agent Buchanan and say . . . I want to help you catch the people that I have been dealing with for the past, you know, 10 years, even my daughter. That's what you do. You derail the train. You cannot get off of that train, you cannot get rid of that understanding unless you either die or derail the train.

Citing to First Circuit precedent, Belanger tells us that withdrawal "[t]ypically [] requires either . . . a full confession to authorities or a communication by the accused to his co-conspirators that he has abandoned the enterprise and its goals." Ciresi, 697 F.3d at 27 (quoting United States v. Piper, 298 F.3d 47, 53 (1st Cir. 2002)) (emphasis added). The train analogy used by the Government, he says, fails to properly convey this "either or" dichotomy. That is, Belanger believes the Government's analogy improperly advised the jury that for withdrawal to apply, the law

- 43 -

requires not just a confession to authorities but also notification to each of the coconspirators.

This supposed problem seems to stem from the lack of the word "or" between the sentence reading "[y]ou go to the other conspirators, every single one of them and say, I'm out, I'm done, I'm finished, I'm through, I don't want anything else to do with drugs," and the sentence reading "[y]ou go to the cops." But from where we sit as an appellate court with considerable distance from the original proceedings, it is not abundantly clear at all whether the lack of the word "or" represents some misstatement of the law or whether, for example, the prosecutor was simply taking a dramatic, disjunctive pause before laying out the alternative means by which Belanger could withdraw. The fact that Belanger's attorney did not object to the articulation below certainly seems to suggest that the remarks were not seen at the time as being erroneous or prejudicial. See United States v. Kasenge, 660 F.3d 537, 543 (1st Cir. 2011) ("This failure not only suggests that [defendant] did not consider the remarks prejudicial, but also deprived the district judge of the opportunity to resolve any potential confusion."); see also United States v. Marshall, 109 F.3d 94, 100 (1st Cir. 1997) (explaining that "an excellent test is whether counsel contemporaneously thinks the line has been crossed, and objects, which, in turn, enables the court to instruct the jury"). And, at the very least, we cannot conclude that the

remarks were "severe."

The Government's closing was far from model and we discourage any further use of it. At the very least, the Government's poor choice of language has led to an appeal on this issue. That said, we cannot find error when the judge gave what was arguably a curative instruction. Indeed, before the judge sent the jury to deliberate, he explained exactly what was required for Belanger's withdrawal argument to be successful. He stated:

> Members of the jury, during the course of closing arguments, you heard reference at times to this idea of withdrawal from a conspiracy. And I want to give you an additional instruction for you to consider in connection with your consideration of Count 1 in this case, the conspiracy count as it applies to both defendants, Mr. Belanger and Ms. Mujo. So I am going to instruct you now on what withdrawal from a conspiracy is. To withdraw from a conspiracy, a conspirator must act affirmatively either to defeat or disavow the purposes of the conspiracy by <u>either</u> making a full confession to authorities <u>or</u> by communicating to his coconspirators that he has abandoned the enterprise and its goals.

(emphasis added). "Our law assumes that jurors follow jury instructions and thus that they followed the judge's, not counsel's, definition. . . ." <u>United States</u> v. <u>Gonzalez-Gonzalez</u>, 136 F.3d 6, 9 (1st Cir. 1998). And so, even if the Government's conveyance of the standard for withdrawal was not as eloquent as it could have been, the judge's subsequent withdrawal instruction certainly cured any possible harm.

Finally, as noted at length above, <u>see</u> <u>supra</u> Part B.2, the evidence suggesting Belanger did not withdraw was quite strong.

Indeed, his behavior upon returning to Maine (i.e., getting back into the drug trade) was indicative not of someone who had disavowed and abandoned the conspiracy, but of someone who took a temporary reprieve.

In sum, no plain error can be detected here.

### 5. Belanger's Sentencing

There's just one last loose end to dispose of. Belanger tells us the district court got it wrong when it inappropriately calculated the drug quantity attributable to him throughout the conspiracy by relying on faulty testimony from drug-addict witnesses (thus yielding a guidelines base offense level of 32) and that it erred in giving him a two-level enhancement under U.S.S.G. § 2D.1.1(b)(12) based on his role as a leader or organizer in the conspiracy. The district court's findings must satisfy the preponderance of the evidence standard. United States v. Pierre, 484 F.3d 75, 89 (1st Cir. 2007). And because those findings are fact-based, we review each for clear error. Id.; United States v. Colón-Muñoz, 318 F.3d 348, 364 (1st Cir. 2003) ("Role-in-the-offense determinations are innately fact-specific. The court of appeals must, therefore, pay careful heed to the sentencing judge's views." (quoting United States v. Rostoff, 53 F.3d 398, 413 (1st Cir. 1995))). Clear error cannot be said to exist unless "on the entire evidence [we are] left with the definite and firm conviction that a mistake has been committed." United States v. Brown, 298

F.3d 120, 122 (1st Cir. 2002) (quoting <u>Anderson</u> v. <u>City of Bessemer City, N.C.</u>, 470 U.S. 564, 573 (1985)) (alteration in original).

We see no reason to venture into the weeds here. The PSR's sentencing guidelines range for Belanger (with the supposedly problematic enhancement and drug quantity calculation) was 235-293 months. But the district court departed downward significantly, imposing a 132-month term of imprisonment. In doing so, the court noted that "the sentence that I just announced is the same sentence that I would impose . . . if I had granted one or more or all of the objections that the defendant has made regarding the sentencing guidelines in this case." Consequently, even if there were merit to Belanger's arguments, any error would necessarily be harmless. <u>See</u> <u>United States</u> v. <u>Fernández–Garay</u>, 788 F.3d 1, 5 (1st Cir. 2015) ("[A]n error is deemed harmless if a reviewing court can say with fair assurance that the sentencing court 'would have imposed the same sentence even without the error.'" (quoting <u>United States</u> v. <u>Tavares</u>, 705 F.3d 4, 25 (1st Cir. 2013))). We therefore have no reason to sort through Belanger's importunings since doing so would yield no change to his 132-month sentence.

## C. Conclusion

Our work here done, we **<u>affirm</u>**.